## Ex parte Holman *et al.*

## I. Per Curiam.

1. **Jurisdiction: STATE AND FEDERAL COURTS: HABEAS CORPUS.** A person who is held in custody under an order issued by a court of the United States, in the regular course of procedure, is not entitled to be released on a writ of habeas corpus issued by a State court. A State court has no right to thus interfere with the proceedings and process of a federal court.

2. —— IN MATTERS OF CONTEMPT. Every court is sole judge in matters of contempt of its orders or authority ; and when a court, having jurisdiction of a cause, is proceeding to arrest a party for contempt, no other court can intermeddle with or stay the proceeding, or on habeas corpus release the party who is being proceeded against.

3. —— Nor can a habeas corpus proceeding be converted into a writ of error for the purpose of inquiring into the validity or regularity of a judgment or order of a court having jurisdiction.

4. —— FEDERAL COURTS. The Supreme Court of the United States is the final arbiter respecting the nature and extent of the judicial power of the United States, and respecting the nature and extent of the jurisdiction which the federal courts possess under the legislation of congress; and its decisions on these questions are binding on all other tribunals.

5. —— MANDAMUS PROCEEDINGS : COLLATERAL ATTACK. The objection, that a mandamus proceeding upon a judgment rendered in the Circuit Court of the United States for a State is void, because the proceeding is in the nature of an original suit, and should have been commenced in the United States court for the State where the defendant then resided, comes too late after judgment unless it be urged on writ of error ; and, if made before judgment and improperly overruled, the order of mandamus would not thereby be renddered void and liable to be collaterally assailed.

6. —— A mandamus proceeding to enforce the collection of a judgment rendered in the Circuit Court of the United States for a State is not in the nature of a new or original action in a jurisdictional sense, but ancillary to, and in continuation of, the original judgment.

7. —— NON-INTERFERENCE BY STATE AND FEDERAL COURTS In the exercise of the jurisdiction confided respectively to the State and federal courts, neither has any right to interfere with or control the operations of the other.

8. —— A State court cannot in any manner interfere with the process of the federal courts, nor prescribe the rules or forms of proceeding, or the *effect* of process therein.

9. —— EFFECT OF JUDGMENT: COLLATERAL ATTACK. Where a federal court for a State has decided that certain prior proceedings of a State court, pleaded as a defense, and as having the effect to deprive the federal court of jurisdiction, are ineffectual for that purpose, such decision is conclusive until reversed on writ of error, and, though erroneous, cannot be collaterally impeached, nor a person arrested thereunder discharged on *habeas corpus*, on the ground that the proceedings are void for want of jurisdiction.

## II. Per BECK, J., dissenting.

10. —— The writ of habeas corpus is not limited as a remedy for illegal restraint under particular authority, but is a remedy against *all* illegal restraint.

11. —— The right of the State courts to inquire into the legality of the imprisonment of a citizen when held under federal authority, has never been surrendered to the federal government, either expressly or by implication.

12. —— Where one is held in imprisonment under claim of federal authority, and it appears that such restraint is illegal because the authority of the officer so holding him is based upon a judgment void for want of jurisdiction, a State court may so declare, and release the prisoner under writ of *habeas corpus*.

13. —— It is a well-settled docrine, that where the United States and State courts have concurrent jurisdiction, and the State court first acquires jurisdiction of the subject-matter, such jurisdiction becomes exclusive, and completely deprives the federal court of jurisdiction.

14. —— The State court having first acquired jurisdiction of the subject-matter of the actions out of which the present proceedings arise, it deprived the federal court of the right to subsequently acquire jurisdiction, and its proceedings are, therefore, void for want thereof. The nature of, and as to what constitutes, jurisdiction of the subject-mattter, examined.

## MONDAY, OCTOBER 11.

NATIONAL AND STATE COURTS: CONFLICT OF AUTHORITY, ETC.: APPLICATION FOR A WRIT OF HABEAS CORPUS. — The petitioners for this writ are the supervisors of the county

of Lee, in the State of Iowa.   The defendant in the peti-
tion for the writ is the deputy United States marshal for
the district of Iowa.

The defendant appeals from an order discharging the
plaintiffs from his custody.

The facts out of which the legal questions arise are
undisputed, and are as follows:

Thompson obtained judgment upon coupons attached
to bonds issued by the county of Lee in payment of stock
in certain railroad corporations.   His action was com-
menced in the United States Court for Iowa, and for suf-
ficient reason was duly transferred, under the act of
congress of February 28, 1839 (5 U. S. Stat. at Large,
322), to the proper United States court of Illinois.   The
county defended, and, among other defenses, pleaded the
injunction proceedings in the State courts of Iowa, which
will be presently mentioned.   The defenses were held
insufficient, and Thompson recovered judgment against
the county, October 19, 1864, in the United States Circuit
Court for the Northern District of Illinois.

Afterward, in 1868, such proceedings upon this judg-
ment were had, in the court last mentioned, that it issued
a peremptory mandamus, requiring the supervisors of the
county to levy and collect a tax to pay the judgment.   To
this proceeding of mandamus the supervisors were parties,
and again pleaded unsuccessfully the State court injunc-
tion and decree.   This order by the United States Cir-
cuit Court of the peremptory writ of mandamus is in full
force.   The writ of mandamus being served, the super-
visors refused to obey; and the court which issued it,
being apprised of the disobedience, issued an attachment,
directed to the marshal for the district of Iowa, com-
manding him to bring the supervisors before the court
to answer for a contempt against its authority.   The
deputy marshal, Fulton, arrested the supervisors on this

writ of attachment; whereupon the supervisors, the plaintiffs in the present proceeding, applied for a writ of *habeas corpus*, claiming that the United States Court for Illinois had no jurisdiction of the subject-matter of the mandamus proceeding or of the persons of the plaintiffs.

The reason given by the supervisors why they did not levy the tax as conmanded by the United States court is, that, prior to the commencment of the suit of Thompson in the United States court, they or their official predecessor had been enjoined by a decree of the Supreme Court of Iowa (entered in June, 1863, as of December 1, 1862) from levying and collecting any taxes to pay certain railroad bonds and coupons issued by the county, among which are those upon which Thompson recovered his judgment. This injunction suit was commenced by certain tax payers, and the county judge and county treasurer were made defendants. Neither Thompson nor any of the bondholders was a party to that proceeding.

A writ of *habeas corpus* was ordered by Mr. Justice BECK, and the deputy marshal, Fulton, under the practice in this State, answered, stating the recovery of judgment by Thompson, the mandamus proceeding, and the attachment for contempt under which he admits he holds the supervisors in custody. He refuses, in his answer, to surrender them to the jurisdiction of the State court, and asks to be discharged from further answer to the writ of *habeas corpus*. Upon the above facts, Mr. Justice BECK, sitting at chambers, was of opinion that the supervisors were illegally restrained of their liberty by the United States marshal, and he entered an order discharging them from his custody.

The grounds of his judgment were stated with great care, force and clearness in the opinion which he then prepared, and which forms the basis of his dissenting opinion in this court.

The marshal appealed from the order of Mr. Justice BECK to this court, and the question, and only question, argued by counsel, and which they united in desiring to have decided, is, Whether the supervisors are, or are not, entitled to be discharged from the custody of the marshal.

*Robert H. Gilmore, J. M. Casey, D. F. Miller and Francis Semple* for the supervisors.

It is claimed by appellees (the supervisors), first, that all the proceedings in the United States court for the Northern District of Illinois are void, for the reason that said court had no jurisdiction over appellees in the matter of said cause in mandamus.

1. Because said action of mandamus was an original action, commenced by a citizen of Pennsylvania, in the said Circuit Court of Illinois, against appellees, who were citizens of Iowa; that the said Circuit Court of the United States is a court of special and limited jurisdiction, and even the consent of the defendants thereto, or their appearance in said action, could not avail to give said court jurisdiction; that the only forum in which said cause could originally have been brought was the Circuit Court for the District of Iowa, or the proper State court of said State of Iowa.

2. Because the said matters and issues involved in said action of mandamus had already been tried and adjudicated, and jurisdiction thereof fully assumed by the State courts of Iowa long prior to the commencement of the actions of assumpsit on which said mandamus cause is based.

*H. Scott Howell* for the marshal.

1. Plaintiffs having been arrested for a contempt of the United States court, no other court will release on

*habeas corpus*. This will be admitted if the United States court had jurisdiction. We claim jurisdiction to punish for contempts will be *presumed* in all cases where it is possible for the court to have ordered the arrest. *People* v. *Nevins*, 1 Hill, 154–166 ; *Cooper* v. *Cable*, 15 Johns. 156 ; *Yates' Case*, 4 id. 366–373 ; Hurd on Habeas Corpus, 370, 371.

2. Each judge or court is sole arbiter of the contempt alleged, and to determine this must of necessity determine the question of jurisdiction. Dillon's Digest, 248, and cases cited ; *Church* v. *Muscatine*, 2 Iowa, 69 ; *Yates' Case*, 4 Johns. 370 ; *People* v. *Spaulding*, 2 Paige, 329.

3. On *habeas corpus*, the court issuing the writ will not look beyond a regular writ of arrest from a court, and try the merits of the case. *Johnston* v. *United States*, 3 McLean, 89 ; *Platt* v. *Harrison*, 6 Iowa, 79–81 ; *Ex parte Green*, 12 id. 213 ; Hurd on Habeas Corpus, 412–416, and 20 cases cited.

4. United States courts are judges as to whether they have jurisdiction or not. A mistake here can only be corrected by an appeal to the Supreme Court of the United States. State courts are estopped to say, on *habeas corpus*, that a United States court had no jurisdiction if the subject-matter was such as that said United States court could have entertained the case. *Olmstead's Case*, 2 Cond. 206, 5 Cranch, 115 ; *Freeman* v. *Howe*, 24 How. 459 ; *Norris* v. *Newton*, 5 McLean, 92, 174 ; *Ex parte Bushnell*, 9 Ohio St. 181–199 ; *Yates' Case*, 4 Johns. 346, 353–356, 360 ; affirmed in 9 id. 239, 426 ; *In re Jordan*, 756, 757, 759–761 ; 11 Am. Law Reg. 749 ; Cooley on Constitutional Limitation (346, 347, and cases cited) speaks of " matters as settled ; " Hurd on Habeas Corpus, 191, 198, 202, 339–343 ; *Kulp* v. *Ricketts*, Brightly's Digest Cases, 1236, note.

5. State courts have no right to prevent the execution of the United States courts' process, which is regular on its face; and they must not entertain jurisdiction when it is made known that a party is held by such process. *Ableman* v. *Booth*, 21 How. 523–525 (unanimous decision); *Freeman* v. *Horn*, 24 id. 459; *United States* v. *Rector*, 5 McLean, 174; *Norris* v. *Newton*, 5 id. 100; *Ex parte Sifferd*, 5 Am. Law Reg. 668–676; *In re McCann*, 14 id. 158, note; *Roselle's Case, Ex parte Robinson*, 6 McLean, 358–365; *Knox County Case*, 24 How. 383–385; *In re Spangler*, 11 Mich. 298; *In re Hopson*, 40 Barb. 34; Hurd on Habeas Corpus, 335–341; Brightly's Federal Digest, 439, §§ 19, 20, 29, 32, 55, 56, 63, 64, 65.

If State court can release, where does the power come from? Not from United States laws or State enactments.

State court has not concurrent jurisdiction where commitment is by United States court. Hurd, 191, and cases.

6. Any court so releasing from commitments of other courts must be a Superior Court or have appellate jurisdiction. Hurd on Habeas Corpus, 351, 352; 10 Wheat. 1; *Rogers* v. *City of Cincinnati*, 5 McLean, 340; 11 Am. Law Reg. 755–760; *Yates' Case*, 4 Johns. 356.

7. The United States court at Chicago did have jurisdiction, first, of the county, by transfer of suit, to render judgment. Brightly's Digest, 130, § 24. Such judgment recognized by this court as valid. *Thomson* v. *Lee County*, 22 Iowa, 206. Second, of the supervisors, by mandamus proceedings. Mandamus, " a civil remedy." Morris on Mandamus, 14, 194. Mandamus, " a command issuing in name of the sovereign authority." Bouvier's Law Dictionary. Mandamus, "not a new suit;" is " auxilliary;" no " stranger can obtain it," etc. *Riggs* v. *Johnson County*, 6 Wal. 197; *Walkly* v. *Mus-*

Ex parte Holman.

*catine*, id. 482; *Webber* v. *Lee County*, id. 212; *Rogers* v. *Lee County*, December Term, 1868, U. S. C. (manuscript opinion); *Kentucky* v. *Denmers*, 24 How. 97; *Maddox* v. *Graham*, 7 Am. Law Reg.; *Blossom* v. *Milwaukee Railroad Co.*, 1 Wall. 635. No known case calls it a new suit.

As United States courts entertain jurisdiction and render judgment, they must execute the collection, and have the right to do so. *Wayman* v. *Southard*, 10 Wheat. 1; *Bank United States* v. *Halstead*, id. 51; *Peck* v. *Jenness*, 7 How. 624.

DILLON, Ch. J. — Treating the questions arising on this appeal in a manner befitting their gravity and importance, it is proposed to refrain from the discussion of all topics which do not necessarily lie in the pathway of the judicial determination of the precise case presented by the record. That the writ of *habeas corpus* is of. transcendant value; that it is the keystone of American as of English liberty; that the people of this State enjoy and have always enjoyed, without denial or abridgment, the right to this writ; and that it is an efficacious remedy against all *illegal* imprisonment, are propositions respecting which there is no dispute, and which command universal assent. Any person within the limits of the State who is illegally restrained of his liberty may apply to a State court or judge for the writ; and it is not enough to deprive such court or judge of the right to act that the return is made that the defendant *claims* to hold the party under the authority of the United States. The truth and good faith of such a claim may at least be inquired into.

Following the decisions in Massachusetts, New York, and other States, I held in *Ex parte Anderson* (16 Iowa, 598) that the State courts had jurisdiction concurrent

*(margin note: 1. JURISDICTION: State and federal courts: habeas corpus.)*

with the national courts to inquire whether the petitioner's enlistment into the army of the United States was valid.

I was not then, nor am I now, disposed to restrict the right to this beneficent remedy; and if it appeared to me in this case that the petitioners were illegally restrained, I should unhesitatingly agree to an affirmance of the order for their enlargement, the more readily because our judgment in such a case (being one to which the appellate power of the Supreme Court of the United States extends under the judiciary act), if erroneous, would be subject to be reviewed and reversed by that tribunal.

A case in which a party is detained by an army officer of the United States, who simply claims that he is regularly enlisted as a soldier, is one which convenience requires should be examined into by the State tribunals, and I see no objection to these tribunals determining, on *habeas corpus*, whether there is any enlistment in fact, or one legally binding upon the petitioner. It was foreseen, says Mr. Justice STORY, in the course of his masterly opinion in *Martin* v. *Hunter* (1 Wheat. 304), "that in the exercise of their ordinary jurisdiction State courts would incidentally take cognizance of cases arising under the Constitution, the laws and treaties of the United States. Yet to all these cases the judicial power, by the very terms of the Constitution, is to extend." 1 Wheat. 342. The case of an inquiry into the validity of an enlistment, where the party is detained by no order or judgment of a court, military or civil, is readily distinguishable from one where the detention is under the order or by virtue of the process of a judicial tribunal. In the one case the court or judge is in the exercise of an ordinary jurisdiction in the usual manner, and may decide upon the rights of the parties, even though these require a construction of an act of congress; but such decision is

subject to the revisory power of the Supreme Court of the United States should it be against the right claimed, or authority exercised, under the national Constitution or some law of congress.

But it yet remains to be decided by the Supreme Court of the Union (as it did when Judge Story wrote his Commentaries on the Constitution; see vol. 2, § 1757), whether even such an authority can be maintained.

In the other case — viz., where the petitioner for the writ of *habeas corpus* seeks to be delivered from an United States officer, having a writ issued by a court of the United States — it is obvious that there would be an end of all effectual authority on its part, if another court could arrest and thwart its proceedings by taking from the hands of its officers those whom it had, in the regular course of procedure, commanded to be arrested and brought before it.

It would be a very extraordinary case which would justify a State court in thus interrupting the exercise of authority by another similar court; and surely a State court has at least no more right to interfere with the proceedings and process of a court of the United States, over which it has not the slightest control, supervisory or otherwise.

In *Ex parte Watkins* (3 Pet. 193) the Supreme Court of the United States was applied to for a *habeas corpus* by a party who had been convicted of an offense in the Circuit Court of the District of Columbia, the ground of the application being that the indictment charged no punishable offense.

In refusing the writ, Chief Justice MARSHALL assigned reasons which equally apply to the cause before us. He says : "With what propriety can this court look into the indictment? We have no power to examine the proceedings on a writ of error, and it would be stange if, under

color of a writ to liberate an individual from unlawful imprisonment, we could substantially reverse a judgment which the law has placed beyond our control. An imprisonment under a judgment cannot be unlawful unless that judgment be an absolute nullity; and it is not a nullity if the court has a general jurisdiction over the subject, although the judgment should be erroneous. If the judgment be obligatory, no court can look behind it. If it be a nullity, the officer who obeys it is guilty of false imprisonment. Would the counsel for the prisoner attempt to maintain this position?"

And so here: how extravagant would be the proposition that an action for false imprisonment could be maintained by the supervisors against the marshal — a logical result of the position that the United States court could not order the attachment. The doctrine of *Ex parte Watkins* was acted upon by this court in *Platt* v. *Harrison*, 6 Iowa, 79.

In my judgment the supervisors are not entitled to be discharged on *habeas corpus*, because the question whether the United States Circuit Court had jurisdiction in the mandamus proceeding was a question for that court to decide. It did decide it, and the supervisors were parties to the proceedings in which the decision was made. That decision is in full force and unreversed. If that decision was erroneous they could appeal to the Supreme Court of the United States. If there decided for them, they need no other remedy. If decided against them, it is final and they are entitled to no other remedy.

Now is it not undeniable, if a State court can on *habeas corpus* release the supervisors from the custody and control of the United States court, that it does, in the language of C. J. MARSHALL, above quoted, "under the color of a writ to liberate from unlawful imprisonment, sub-

stantially reverse a judgment which the law has placed beyond its control."

But, without resting on this ground or on this chiefly, I proceed to examine the question whether or not the United States court in Illinois did have jurisdiction in the mandamus proceeding.

The petitioners in the case now in judgment were arrested by the defendant, the deputy marshal, for an alleged contempt of the United States court. 2. —— in matters of contempt. They were arrested under the process of that court. It is admitted on all hands that every court is sole judge in matters of contempt of its orders or authority. It is also admitted to be the law, as it undoubtedly is, that, when a court, *having jurisdiction* of a cause, is proceeding to arrest a party for contempt, no other court can intermeddle with, or stay, the proceeding, or on *habeas corpus*, or in any other way, discharge the party who is being proceeded against. This is familiar law, and it has been so long settled that it is not necessary to refer to the many authorities establishing it.

Equally familiar and equally undisputed is the doctrine that a *habeas corpus* proceeding cannot be converted into a writ of error; hence, in the present case, no inquiry is admissible into the validity of the judgment which Thompson obtained against the county in the United States court; nor into the validity of the order for the writ of mandamus; nor into the regularity of the order for the attachment for the contempt, if that court had jurisdiction of the cause, *i. e.*, of the persons and the subject-matter. The counsel in the cause, and all the members of this court, concur in the proposition that, if the United States court had jurisdiction in the cause or proceeding in which the attachment was issued, whereon the supervisors were arrested, they were not entitled to be discharged on *habeas corpus*. So that there is but

one ultimate inquiry, but one controverted question, in the case, and that is, whether the United States court had *jurisdiction* of the cause or proceeding in which the attachment was ordered. The counsel for the supervisors make no other point than the one denying *in toto* the jurisdiction of that court in the mandamus proceeding.

Before proceeding to examine the soundness of this position, it is proper to advert to another principle of law

4. —— federal courts. respecting which there can be no dispute, and which has an important relation to the questions in controversy. It is this: That the decisions of the Supreme Court of the United States upon questions arising under the national Constitution and the laws of congress are binding upon the State courts, and conclusive upon all persons.

The Constitution of the United States in terms provides:

ART. 6. "This Constitution, and the laws which shall be made in pursuance thereof * * *shall be the supreme law of the land; and the judges in every State shall be bound thereby,* any thing in the Constitution or laws of any State to the contrary notwithstanding."

ART. 3, SEC. 1. "The judicial power of the United States shall be vested in one Supreme Court," etc.

"SEC. 2. The judicial power shall extend to all cases of law or equity arising under this Constitution, the laws of the United States * * * to controversies between citizens of different States," etc., etc.

It is the result of these various provisions, that the Supreme Court of the United States is the final arbiter respecting the nature and extent of the judicial power of the United States, and respecting the nature and extent of the jurisdiction which the courts of the United States possess under the constitutional legislation of congress.

The jurisdiction of the courts of the United States has been conferred in some instances with exclusive reference to the character of the case, or controversy, and in others with exclusive reference to the character of the parties; but whether it has been conferred by reason of the one consideration or the other, the express determination of the Supreme Court of the United States as to the extent of such jurisdiction, what cases are embraced within it, what persons are subject to it, what judgments may be rendered, by what process and in what manner they may be enforced, is final, authoritative, absolutely binding upon all persons and all tribunals, including "the judges in every State, any thing in the Constitution and laws of any State to the contrary notwithstanding."

If the propositions just stated had not frequently been solemnly affirmed to be true by the Supreme Court of the United States, our reason and judgment would teach us that they ought to be true, for otherwise, with our complicated system of national and State governments, united and yet separate, we should have perpetual discord and unending conflict. No other doctrine could secure harmony or uniformity.

With this statement of some of the leading and undisputed principles of law having direct relation to the case, we proceed to the inquiry whether the Circuit Court of the United States for the Northern District of Illinois *had jurisdiction* of the cause or proceeding in which the process of attachment issued. The point made by counsel is, that the court "had no jurisdiction over the appellees (the supervisors) in the matter of the said cause in mandamus."

That it had jurisdiction of the suit of Thompson against the county, on the coupons, is not denied; nor *can* it be denied. That suit was commenced by Thompson, a citizen of Pennsylvania, in the proper United

States court for Iowa.    The county was duly served and in court.    Under the act of congress of February 28, 1839 (5 U. S. St. 322), the cause was transferred to the above-mentioned court in Illinois.    This act provides for such transfers in certain cases, and that the court to which the transfer is made shall " take cognizance thereof in the same manner as if such suit had been rightfully and originally commenced therein, and shall proceed to hear and determine the same; *and proper process for the due execution of the judgment or decree therein rendered shall run into and be executed in the district from which said suit was removed.*"    That this act of congress is still in full force was expressly ruled by the Supreme Court of the United States at its December term, 1868, in the case of *The Supervisors of Lee County* v. *United States ex rel. Rogers,* 7 Wall. 175.

The first ground of objection taken by counsel to the jurisdiction of the Illinois court is that the mandamus proceeding therein was a *new and original action,* and should have been brought in Iowa, and could not be commenced in Illinois against persons resident in the district of Iowa, and that in such case the appearance of the parties would not operate to confer jurisdiction.    It will be remembered that the judgment in favor of Thompson, and against the county of Lee, was rendered in the Illinois court, the action having, under the act of congress just referred to, been duly transferred thereto; that this judgment was made the basis of the mandamus proceedings therein designed to enforce its collection; that the county appeared, defended, was unsuccessful, and the mandamus ordered, and that this order remains in full force.

It is now insisted that these proceedings and orders are all void because the mandamus proceeding was an original action; and if so, then it ought to have been commenced

5.—mandamus proceedings: collateral attack.

in the United States Court for Iowa, the defendant (petitioner in *habeas corpus*) being resident of that district.

To this position there are two answers, both good, and one conclusive:

1. If this objection (which, it will be perceived, relates to the character and residence of *the parties*, and not to the *subject-matter*) was not made when the mandamus proceedings were pending and in that court, it is waived and comes too late after judgment, unless it be urged on error. If made and improperly overruled, it would not render the order for the mandamus *void* and liable to be collaterally impeached, but the order would be valid and binding until reversed by a writ of error. Than this nothing can be plainer on principle. See *Huff* v. *Hutchinson*, 14 How. (U. S.) 586; *Kennedy* v. *Georgia State Bank*, 8 id. 586, and cases cited; *Ex parte Watkins*, 3 Pet. 193, 207; *Voorhees* v. *The Bank*, 10 id. 449.

2. Whether the mandamus proceeding is new and original, or supplemental and auxiliary, is a question not to be determined with reference to previous rules, but (to use the language of Mr. Justice MILLER, in which he states the true criterion with his accustomed perspicuity) " with reference to the line sanctioned by this court (the Supreme Court of the United States), which divides the jurisdiction of the federal courts from that of the State courts." *Minnesota Co.* v. *St. Paul Co.*, 2 Wall. 609, 633. In cases like the present, where a public corporation is the debtor, the Supreme Court of the United States have had the question before it as to the nature of the mandamus proceedings, and it has, in several instances, and upon full consideration, expressly decided that such proceedings are not in the nature of a new or original action in the jurisdictional sense, but supplementary to, and in continuation and aid of, the original judgment. On this precise point the leading case is

*Riggs* v. *Johnson County*, 6 Wall. 166. The conclusion of the court is thus expressed by Mr. Justice CLIFFORD:

" The Circuit Court in the several States may issue the writ of mandamus in a proper case when it is necessary to the exercise of their respective jurisdictions, agreeably to the principles and usages of the law. When such an exigency arises they may issue it, but when so employed it is neither a prerogative writ *nor a new suit in the jurisdictional sense.* On the contrary, it is a proceeding ancillary to the judgment which gives jurisdiction, and when issued becomes the substitute for the ordinary process of execution to enforce the payment of the same as provided in the contract." Id. 198. To the same effect, treating the mandamus as process subsequent to judgment, see also *United States, etc.,* v. *Counil of Keokuk,* 6 Wall. 514, 518, 520; *Weber* v. *Lee County,* id. 210.

This language may be open to verbal criticism for inaccuracy, but its meaning and force are unmistakable. This authoritative and repeated declaration of the law is *an end of controversy,* at least in every court except the one in which it was announced. Its correctness may be doubted or denied, but its authority must be admitted and obeyed. For, as above shown, the decision of the National Supreme Court as to the jurisdiction and process of the courts of the Union, is final and conclusive upon all persons and all tribunals. *Wayman* v. *Southard,* 10 Wheat. 1, 23; *United States* v. *Peters,* 5 Cranch, 115, 136; *Bank* v. *Halstead,* 10 Wheat. 56.

When the United States court treat the mandamus as mere process — a substitute in this class of cases for the ordinary execution — can any other court decide that they are mistaken, and thereon base a right to interfere with the execution of the writ? Clearly not.

A State court, as respects causes and judgments therein, may decide that this is not the law; but a State court

cannot decide that such is not the law in the courts of the United States.

It being settled, then, that the mandamus proceeding must be regarded as merely ancillary to the judgment, and in the nature of process to enforce its collection, another principle of law well settled, reasonable in itself, and universally acted on, and absolutely essential to the harmonious working of our duplex system of government, has here a most important place. Reference is here made to the principle of reciprocal non-interference by the national and State courts with each other.

*7. —— non-interference by state and federal courts.*

On this subject the effect of the decisions down to the period when he wrote is well stated by Mr. Justice STORY, in his Commentaries on the Constitution. He says: " In the exercise of the jurisdiction confided respectively to the State courts and those of the United States (where the latter have not appellate jurisdiction), *it is plain that neither can have any right to interfere with, or control, the operations of the other.* It has accordingly been settled, that no State court can issue an injunction upon any judgment in a court of the United States; *the latter having an exclusive authority over its own judgments and proceedings. McKim* v. *Voorhies,* 7 Cranch, 279. Nor can any State court or any State legislature annul the judgments of the courts of the United States, or destroy rights acquired under them (*United States* v. *Peters,* 5 id. 115); nor in any manner deprive the Supreme Court of its appellate jurisdiction (*Wilson* v. *Mason,* 1 id. 94); *nor in any manner interfere with or control the process* (whether mesne or final) *of the courts of the United States* (*United States* v. *Wilson,* 8 Wheat. 253); nor prescribe the rules or forms of proceeding, *nor effect of process* in the courts of the United States. *Wayman* v. *South-*

*ard*, 10 id. 1, 21, 22; *Bank of the United States* v. *Halstead*, id. 51.    *   *    Indeed, where the judicial power of the United States is to be exercised, it is for congress alone to furnish the rules of proceedings, to direct the process, to declare the nature and effect of the process, and the mode in which judgments consequent thereon shall be executed.    No State legislature or State court can have the right to interfere.    *    *    On the other hand, the national courts have no authority (in cases not within the appellate jurisdiction of the United States) to issue injunctions to judgments in the State courts (*Diggs* v. *Walcott*, 4 Cranch, 178; see also 1 St. at Large, 335; *Randall* v. *Howard*, 2 Black. 585), or in any other manner interfere with their jurisdiction or proceedings.    *Ex parte Calvesa*, 1 Wash. C. C. 232." Story's Com. Const. §§ 1757–1759.

The same principle has since been applied in holding that a sheriff cannot replevy property from the United States marshal. *Freeman* v. *Howe*, 24 How. 450, 455; and see *Buck* v. *Colbath*, 3 Wall. 334.

And the same doctrine has been specifically applied by the Supreme Court of the United States in cases identical with the present. *Riggs* v. *Johnson Co.*, 6 Wall. 166, 198; *Weber* v. *Lee Co.*, id. 210; *United States* v. *Council of Keokuk*, id. 514.

In the case last cited the facts were these: Suit on railroad coupons and judgment in the United States court for the plaintiff, October 19, 1864. He subsequently applied for a mandamus to compel the city to levy a tax to pay it. Return to writ, that on October 9, 1863, *before relator obtained his judgment*, the city was enjoined by the State court, to which proceeding, however, the creditor was not a party. The United States Circuit Court held this return sufficient; but its judgment was reversed by the Supreme Court of the United States, which placed

its reversal upon the distinct ground, that, in such a case, mandamus is the proper remedy of the creditor to collect his judgment, and "that a State court cannot enjoin the process of the federal courts," following *Riggs* v. *Johnson Co., supra.* In another case between the same parties the court observes: "Suffice it to say that we adhere *to the rule that the injunction issued by a State court is inoperative to control, or in any manner affect, process or proceedings in the Circuit Court of the United States.*" *United States* v. *Keokuk,* 6 Wall. 520, per CLIFFORD, J.

The suggestion that it makes a difference if the injunction is issued *before* judgment, and not *after* it, as in the Riggs case, is immaterial, as shown by the facts of the Keokuk case, just cited, in which the State court injunction was prior in date to the judgment in the United States court.

The doctrine is, that the one court shall not interfere with the operations of the other *at any time*, whether before or after judgment. It is the fact of interference, under a claim of right, and not the time when this right may be actually exercised, that is objectionable, and which leads to conflict and difficulty.

This the law avoids by the doctrine that one court cannot interfere with the process or operation of the other.

But the ground mainly relied on to show that the Circuit Court of the United States had no jurisdiction in the mandamus proceeding is, that the *subject-matter* thereof had long before been adjudicated by the State court, which made perpetual the injunction against the county officers, restraining them from levying any tax to pay railroad bonds or coupons.

That such an order was made by the State court, in a suit by certain tax payers against the county officers, is an admitted fact. It is also an admitted fact, that not a single bondholder, whose rights it is now claimed have

been judicially cut off, was a party to the proceeding in the State court. For two reasons the effect of the proceeding in the State court cannot be that which is claimed for it by the supervisors.

1. Because it is a fundamental, vital principle of the law that no man can be affected by any judicial proceeding to which he is not a party. No person can be concluded unless he has had a day in court. The law, before it decides against any man, or any man's rights, gives him an opportunity to be heard. It is no answer to say that the validity of these bonds was a question of law, and that the decision would have been the same had the bondholders been before the court. If the plaintiff in this case had been a party to the injunction suit in the State court, his counsel might have been able to prevent that decree, by satisfying the court that it ought not to render it, or by removing the cause, if grounds existed, to the court of the United States.

I do not say that the bondholders are absolutely necessary parties to such a suit; but I do hold, that, if not parties, they are not bound, and the proceedings and decree are, as to them, *res inter alios acta*. On this point I have no doubt, nor never had. I so decided on the bench of the District Court, in 1863, in the case of *Barrows* v. *The City of Davenport*, and my opinion remains still the same.

2. The second reason why the State court proceeding cannot be held to operate to deprive the court of the United States of jurisdiction in the mandamus proceeding is, that the Supreme Court of the Union has so decided, and that decision is conclusive. This is the very point ruled in *Riggs* v. *Johnson County*, 6 Wall. 169, followed and re-affirmed in *Weber* v. *Lee County*, id. 210, and *United States* v. *Council of Keokuk*, id. 514; *Same* v *Same*, id. 520. These cases, applied to the one under

consideration, declare these principles, to wit. : The Constitution of the United States and the constitutional legislation of congress are the supreme law, paramount over all and binding upon all.    These give Thompson, a non-resident of Iowa, a *constitutional* right to sue the county of Lee in the courts of the United States.    Of this right no State legislature nor court can deprive him without his consent.    If he should be made a party to a proceeding in the State court, he might remove, if he saw fit, the cause to the proper court of the United States.    In pursuance of his constitutional right, he did sue in the United States court on his coupons, and obtained his judgment.    That this judgment is valid, and that the court rendering it had jurisdiction, are undoubted propositions, not denied by the counsel for the supervisors. And, in passing, it may be remarked that this court has, in the most solemn manner, affirmed the validity of judgments rendered by the United States courts on railroad bonds, by deciding that such judgments may be the basis of a recovery in the State courts, and that they conclude all defenses on the merits.    *Thompson* v. *Lee County*, 22 Iowa, 206, 1867.

If, then, as counsel concede, and as both the Supreme Court of the United States and of this State have decided, Thompson's judgment in the cause at bar is valid, it is alone for the court of the United States in which it was rendered to decide how it may be enforced, and no State court can, in any manner, or at any time, interfere with its collection, or revise or control the methods or process adopted to make such collection ; and that since the court which rendered it holds that he is entitled to a mandamus as a substitute for an ordinary execution, a State court can no more interfere with this process than with an ordinary writ of *fieri facias*.

The mandamus, in this light, is a mere incident to the

judgment. It is illogical to assert that the court had jurisdiction to render the judgment, but none to award the process to enforce it. It would be a strange doctrine to declare that Thompson has a valid judgment, but that the court has been deprived of all effectual power to cause to be rendered to him the legitimate fruits of such a judgment.

That the foregoing views do not mistake the decision of the Supreme Court of the United States will be apparent from a brief extract from its judgment in *Riggs* v. *Johnson County*, before cited: "Jurisdiction," says CLIFFORD, J., "is defined to be the power to hear and determine the subject-matter in controversy in the suit before the court; *and the rule is universal that if the power is conferred to render the judgment or enter the decree, it also includes the power to issue process to enforce such judgment or decree.*"

"Process subsequent to judgment is as essential to jurisdiction as process antecedent to judgment, else the judicial power (of the United States) would be incomplete and entirely inadequate to the purposes for which it was conferred by the Constitution." 6 Wall. 187.

The result is that the writ of mandamus "is a proceeding ancillary to the *judgment which gives the jurisdiction*, and when issued becomes a substitute for the ordinary process of execution to enforce the payment of the same." Id. 198.

It results that if the injunction proceedings did not oust the court of the United States of the jurisdiction to render the judgment, it did not oust it of the inseparable and incidental power to issue process to enforce it.

If it had this jurisdiction, then it is admitted on all hands that it might proceed to punish for contempt of its authority, and that where so proceeding its process or operations cannot be interfered with by any other court,

and certainly not by one which does not exercise supervisory power.

The United States court in Illinois, to which the cause was transferred, as to jurisdiction, power and process, stands in the place of the court in Iowa, from which the transfer was made, and may order an attachment in like manner, and the act of congress is express that "*proper process for the due execution of the judgment or decree rendered therein shall run into and be executed in the district from which the suit was removed.*" 5 Stat. at Large, 322; *Supervisors of Lee Co.* v. *United States ex rel. Rogers,* 7 Wall. 175. Hence it will be perceived that the decisions of the Supreme Court of the United States cover the whole ground of controversy, and admit of no possible escape from the conclusion that the arrest of the supervisors was not illegal, and that they cannot be discharged therefrom on *habeas corpus* by any State judge or court. This is the supreme law of the land, binding upon the judges of every State.

This result will disappoint many of our people, and perhaps gratify but few. But it is the law, and it must be so declared, notwithstanding the sympathy of the tribunal declaring it with those cities and counties which incautiously incurred large obligations, increased in many instances by large arrearages of interest to an amount beyond their present ability to meet.

But there are evils greater than bankruptcy, and among these should be classed judicial conflicts between the State and national authorities.

If, in a matter to which its appellate jurisdiction did not extend, the Supreme Court of the United States should attempt to invade the constitutional rights of the court, it would be its duty, and one which I trust it would discharge with becoming dignity, manly firmness and lofty independence, not to allow the attempt to suc-

ceed. But in a matter to which its appellate jurisdiction does extend—*and such is the present case*—it is the superior and supervising tribunal—and this court has but one duty to perform, and that is, to obey its judgments, whether they deem them right or deem them wrong.

Because the national Supreme Court decides that the bondholders may enforce their bonds in the courts of the United States, this court is not bound to follow that decision, and hold that they may also recover thereon in the State courts. This court may believe, as I do believe, that that court mistook precedent and duty, in affecting to consider the decisions in this State on the subject to be unsettled, and in not following the latest adjudications of this court, in a matter wholly arising under the State Constitution and laws, and in following prior and overruled decisions of the Supreme Court of this State ; but if so, this mistake cannot be rectified by an interference on the part of the State tribunals with the judgments and operations and officers of the courts of the United States. That this is so, all thoughtful and reflecting citizens will readily admit.

Each court must keep within its own orbit; each must respect the rights and the feelings of the other. On these conditions, and not otherwise, can conflict and discord be avoided. I cannot more appropriately conclude, perhaps, than by following Chancellor Kent (1 Com.), and using the fine language which Sir William Blackstone applied to the people of England, and, applying it to the people and the courts of Iowa in their subordinate relations to the Constitution, laws and government of the United States, declare, that they are " LOYAL, YET FREE ; OBEDIENT, YET INDEPENDENT."

WRIGHT, J. — I need not, *in words*, express my firm and decided conviction that, in the unfortunate and un-

pleasant conflict of opinion existing between the federal and State courts touching "county railroad bonds," the State tribunals have ever had the law, the Constitution and precedent on their side. This proposition I announced, in effect, as long ago as 1857 (*Clapp* v. *Cedar County*, 5 Iowa, 15), and, in all the opinions of this court on the subject since, whether written by myself or others, I have adhered with the utmost, and, as I believe, most consistent, tenacity to its truth, in all its length and breadth. I believe the bonds are *void;* that there was no semblance of *power* to issue them; that there can be no such thing as an *innocent holder* of such paper; that this is the settled adjudication of this court, having before it, as a court of last resort for the State, and giving a construction to, the Constitution and laws of the State, and that, by all the well-settled federal judicial history, this ruling became, by comity, by necessity, and upon the clearest principle, the rule to guide the national judiciary. Of the sincerity and firmness of this belief and these convictions, I repeat, I need give no assurance; since my connection with the question, what I have said or approved almost every term for the last twelve years furnish all requisite demonstration. And just here I stand yet; and however much I may feel constrained, from a sense of duty and an appreciation of what is due to the judgment of a tribunal having jurisdiction to bow to its commands and orders, I shall do so, having more respect for the axe than the executioner. But I trust I shall remember my obligations to the law, my duty to obey settled rules of adjudication, and that neither a feeling of deep wrong to the State, nor a disregard of legal principles by others, shall ever lead me to depart from those rules and fundamental principles essential to the protection of every citizen of the land in life, liberty and property. If others violate the law, I must not. And how-

ever strong my feelings, however earnest my desire as an. individual to defy the power that strikes almost without hearing, however deep my conviction of the wrong perpetrated upon thousands of innocent tax payers, however earnest my anxiety to avert the apparently unfeeling blow, I must and will declare the law as I understand it ; esteeming that thereby I am in the only safe line of duty, and also preserving the State and its tribunals from that reproach which ever and justly follows a departure from principle. It will never do from any motive to overturn fundamental and well-settled legal principles.

Having said this much generally, I come to what, to me, is the question in this case, and what, to my mind, is of even *too* easy solution.

Conceding all that has been said by Justice BECK in his most elaborate and well-considered opinion in the hearing before him (and so ably fortified by what he has said in this court), as to the power of a State court, or judge, to relieve one *illegally* held under pretense of federal authority, judicial or otherwise — I say, conceding all this, the very question is whether petitioners were thus *illegally* held. And I am not mistaken in saying that this depends upon whether the court ordering the attachment and arrest had jurisdiction of the subject-matter and parties, so that the *power* existed to make the same.

To my mind, it is immaterial whether the mandamus proceeding is a "new suit," or "ancillary," merely, to the judgment — taking the place of the ordinary process of execution to enforce its payment, and this because there was a *judgment* by a court having undeniable jurisdiction over the parties and subject-matter, that the creditor (Thompson) should recover so much against the county. Whatever views are entertained of the *correctness* of this judgment, none are urged, as I understand,

against its absolute verity and validity. In *that action*, as also in *the mandamus proceeding, the proceedings in the injunction suit were pleaded as a defense, and held insufficient in the federal court; and this holding remains unreversed and undisturbed.* And just here, I am constrained to believe, is the impassable barrier to plaintiffs' relief in this proceeding. The argument in their favor is based upon the mistake, as I humbly conceive, of confounding the erroneous conclusions of the court in overruling the defense, with its want of power to so hold. And yet if *payment* of the judgment since its rendition had been set up and held unsustained by the evidence offered, the *power* to so hold and the conclusiveness thereof would scarcely be denied. Or, suppose the holding had been that such a defense was not good at, or as matter of, law, however erroneous, would it be void? So, too, if the supervisors had set up a release to the county— a levy upon property and its abandonment under such circumstances as were claimed to satisfy the writ and demand; or other matter in bar of the writ, or in excuse, for not obeying the ultimate mandate, and any such defenses, either upon these facts, or in law, were held insufficient, I confess it would be a new doctrine, and as dangerous as new, that in a proceeding of this character, the correctness of such holding or ruling could be reviewed. It matters not that the State tribunals, first obtaining jurisdiction, first determined ever so correctly that the tax should not be levied — it matters not that, as an original question, I would determine that the order excused the petitioners from the discharge of a duty which might otherwise have resulted from their office or trust. The difficulty is that a competent tribunal having these very questions before it has determined in effect that the *priority of the order or jurisdiction makes no difference; that the injunction proceedings constituted no defense.*

The reasoning that the object of the injunction suit was to *prevent* the collection of the taxes, that of the mandamus action to *enforce* the collection, that hence the same subject-matter was involved in both, and that as our courts *first* obtained jurisdiction and restrained the collection, therefore the order of the levy and the following attachment against plaintiffs for contempt for disobeying the order is void, in my humble judgment omits one most important and elemental consideration. It leaves out the thought or fact that a court of competent jurisdiction *has determined that the State proceedings constitute no defense.* Upon what ground it was so determined I do not know. Whether because the evidence *did not sustain the defense*, or because it was held insufficient *in law*, I do not know, nor to my mind does it make the least difference. Nor does it make any difference that I may esteem it, as I do, ever so erroneous. It is no part of my duty or right to review that action and purpose in this proceeding. It stands there an unimpeached verity. Upon appeal to the proper tribunal, it of course could be re-examined, but I hardly think that this can be done here. So a direct attack to set aside the levy of the tax after made would, if any course will avail, be more regular and better than this proceeding, which resists, by *habeas corpus*, a judgment or order made by a tribunal, which, I repeat, though ever so erroneous, is none the less binding. The principle is clear enough. It has been settled again and again, almost as long as courts have had an existence. However unwilling, I cannot do otherwise than apply it in this as in other cases where it is applicable, if its application is involved.

COLE, J. — I think this judgment should be reversed. But the space already occupied by the opinions of my

brothers seems to require that I shall only state concisely the leading ground on which my judgment is based.

The writ of *habeas corpus* is not a writ of error, under which the court or judge issuing the *habeas corpus* may correct errors of judgment made by another court or judge. If the court or judge ordering the arrest or commitment of the prisoner had *jurisdiction* to so order, the error, if any, in making the order must be corrected by some other proceeding. The only question, then, to be determined is, did the federal court have jurisdiction to order the arrest of the petitioners in this *habeas corpus?*

Upon this I remark, it is conceded that the federal court had rightful and complete jurisdiction over the parties and subject-matter of the suit in the action upon the *coupons* wherein the judgment was rendered. Nor is it in the least controverted that that court has jurisdiction to issue the writ of mandamus in proper cases to enforce its judgments; nor that it had jurisdiction *to issue* the alternative writ of mandamus in this case. The real and precise point upon which the petitioners were discharged being that, since the State and federal courts had original concurrent jurisdiction of the subject-matter of ordering a levy of taxes to pay the bonds and coupons, and the State court having first acquired or exercised its jurisdiction and prohibited the levy by its judgment and process of injunction, therefore the federal court was ousted of its jurisdiction; and this, pursuant to the hitherto well-recognized rule that, where two courts have concurrent jurisdiction of the same subject-matter, the court *first* exercising its jurisdiction thereby excludes the other.

But the federal court having jurisdiction to issue the alternative writ of mandamus, must, of course, have jurisdiction to hear the return to that writ and to judge of its sufficiency. Now, although that court may err in its judgment as to the sufficiency of the return, such *error*

would not oust it of its *jurisdiction*.   That return to the alternative writ of mandamus having stated, as I understand it, that the State court had first acquired or exercised jurisdiction of the subject-matter of the levy, and enjoined the defendants in the writ (these petitioners) from levying any tax to pay said coupons, it was, in my opinion, the duty of the federal court to hold such return sufficient, and to refuse to make the writ peremptory. But the court held otherwise.   That court had jurisdiction to determine, and it was its duty to determine, the sufficiency or insufficiency of that return, and although, in my opinion, it determined it erroneously, such error could not oust the court of its jurisdiction, nor authorize any other court, except the proper appellate tribunal, to relieve the defendants therein from obedience to its judgment.   In other words, the federal court having had jurisdiction to decide the question before it, its decision was final and conclusive upon the defendants, and also upon all other courts, until reversed ; and a reversal cannot be obtained under a writ of *habeas corpus*, but only in the proper appellate tribunal.

The question presented by the *habeas corpus* proceeding is simply one of jurisdiction ; and, of course, my opinion is limited to that single question.   What may be the rights of the tax payers in relation to enjoining the treasurer from collecting the taxes, if any should be levied, or to any other remedy, I do not indicate or decide.   But it may be observed that other questions than that of mere incidental jurisdiction may underlie those rights, and exert a controlling influence in their adjudication.

The order discharging the petitioners must be

Reversed.

The following are the opinions of Mr. Justice BECK at chambers and his dissenting opinion on appeal.   The opinion at chambers, being filed with and made a part of

the dissenting opinion, is published in connection there-with :

## OPINION AT CHAMBERS.

BECK, J. — The petition for the writ of *habeas corpus* alleges that Joseph Holman and twelve others are un-lawfully restrained of their liberty by defendant. The cause of such restraint, as shown by the petition, is as follows : The defendant is a deputy United States mar-shal for the district of Iowa, and, as such, arrested plaint-iffs on a writ of attachment issued by order of the United States Circuit Court for the Northern District of the State of Illinois, with the object of unlawfully taking them to the city of Chicago, in the State of Illinois, to answer an alleged contempt against the authority of said Circuit Court. The cause of said arrest and imprisonment is alleged to be illegal in this, viz.: That one J. Edgar Thompson has recovered three several judgments against the county of Lee, in the State of Iowa, in said Circuit Court of the United States, upon the coupons of certain railroad bonds issued by the officers of said county. The said actions, in which said judgments were rendered, were brought in the United States Circuit Court of Iowa, but changed to the said Circuit Court of Illinois ; that, prior to the commencement of said actions and any pro-ceeding had therein, certain citizens and tax payers of said Lee county commenced a proceeding in chancery, in the district court of Lee county, against the county officers of Lee county, the treasurer and county judge, to enjoin and restrain the said county from levying and collecting any taxes for the payment of said bonds and coupons ; that by the final judgment of the Supreme Court of the State in said cause, the said county of Lee and the said officers thereof, and their successors in office, were per-petually enjoined and restrained from levying and col-lecting any taxes for that purpose ; that the plaintiffs are

the supervisors of said county and the successors in office of the county judge, and the Supreme Court rendering such decree had acquired complete jurisdiction of their persons as well as of the subject-matter involved in said suit in chancery; that said Thompson, upon his said judgments, instituted a mandamus proceeding which resulted in a peremptory writ of mandamus to plaintiffs, commanding them to levy and collect taxes to pay said judgments; that plaintiffs, being enjoined and restrained by the judgment of the Supreme Court of Iowa from so doing, as in duty bound, refused to obey said peremptory writ; whereupon the said Circuit Court of the United States issued a writ of attachment, directed to the United States marshal of Iowa, commanding him to arrest said plaintiffs and bring them before said court to answer to a contempt against its authority. The petitioners aver that said Circuit Court of the United States for the Northern District of Illinois has, and can have, no jurisdiction of the subject-matter of said mandamus proceeding or of the persons of plaintiffs, and therefore all the proceedings and orders had therein are void and of no effect, and the writ issued thereon, upon which plaintiffs are held, is no authority for their arrest, which is wholly illegal. A copy of the writ of attachment upon which the plaintiffs are held in arrest is attached to the petition, as well as properly certified transcripts of the proceedings and judgments in the suits upon the coupons, the proceedings, orders and writs in the mandamus proceeding, and the proceedings, orders and final decree in the injunction suit. Full, exemplified and properly authenticated transcripts in all of these actions are made a part of the petition.

Upon this petition a writ of *habeas corpus* was issued, and, upon the return thereof, the marshal appeared and, in accordance with the statutes of Iowa, answered the

petition, stating, substantially, as in the petition, the proceedings in the actions at law upon which judgments were rendered against Lee county, at the suit of said Thompson, and also the proceedings in the mandamus action, and setting out, by copy, the writ upon which the plaintiffs were arrested by him, and admitting that he holds plaintiffs in his custody and under restraint. In his answer he states that he refuses to surrender the plaintiffs to the jurisdiction of the judge issuing the writ, or to the jurisdiction of the State courts, and that he intends to take them before the said Circuit Court of the United States for the Northern District of Illinois, and asks to be discharged from further answer to the writ of *habeas corpus.* The answer makes no denial of any of the allegations of the petition, but makes some statements, as of non-payment of the judgments, etc., that are not averred or denied in the petition. It is sworn to by the defendant.

The facts disclosed by the evidence are, substantially, so far as they are important to a proper understanding of the points of law ruled and the final order made, as follows:

1. J. Edgar Thompson, a citizen of Pennsylvania, brought three several actions against the county of Lee in the United States Circuit Court for the District of Iowa, upon coupons of certain bonds issued by the officers of the county on the first of January, 1857, in payment of subscriptions made by the officers of the county to the capital stock of certain railroad corporations. Two of these suits were commenced on the 4th day of April, 1863, and the other one on the 9th day of April, 1864. They were transferred, under provisions of the United States statutes, to the Circuit Court for the Northern District of Illinois, at Chicago, and judgments were rendered

in each of them against the defendant, Lee county, on the 19th day of October, 1864.

2. On the 10th day of July, 1868, said Thompson commenced a proceeding of mandamus to require the board of supervisors of Lee county to levy a tax to pay said judgments. This board is charged with the duty of levying taxes. The alternative writ was issued July 10th, 1868, returnable on the first Monday of October, 1868, when said board were ordered to levy said tax to pay said judgments, and, on the 29th day of October, 1868, a peremptory writ issued requiring them so to do. The supervisors refusing to obey said peremptory writ, the attachment issued on the 4th day of January, 1869, directed to the marshal for the district of Iowa, commanding him to bring the bodies of plaintiffs before said court to answer for a contempt in disobeying said peremptory writ.

3. On the 28th day of July, 1860, Eli McMillan and others, citizens and tax payers of Lee county, filed their petition in chancery in the District Court of Lee county, against the county judge and treasurer of said county, praying that said officers, and their successors in office may be perpetually restrained and enjoined from levying and collecting taxes to pay certain railroad bonds and coupons issued by the officers of the county, among which are the coupons that are the foundation of Thompson's judgments. Appearance was entered for defendants in this case December 13, 1860, and time taken to plead.

A demurrer was filed March 11, 1861, the venue of the cause changed by consent to Henry County District Court, and judgment for defendants on the demurrer there rendered. The cause was appealed to the Supreme Court of the State, and decided October 18th, 1862, and judgment entered therein December 1, 1862, reversing the decision of the District Court. On the 5th June,

1863, a decree was rendered, *nunc pro tunc*, in accordance with the prayer of the petition, enjoining and restraining the supervisors of the county, who, by a change in the law of the State, succeeded to the official duties of the county judge, in all matters pertaining to the levying of taxes, on the 1st day of January, 1861.   The supervisors employed counsel, and, through them, appeared and defended the cause in the District and Supreme Court.   The entry of the final decree in the Supreme instead of the District Court was upon consent of the supervisors through their counsel.

In the actions upon the coupons, as well as in the mandamus proceeding in the United States Circuit Court, the proceedings and final decree in the injunction suit were pleaded as a defense, but held insufficient by that court.

In discussing the questions involved in the proceeding before me, it will not be necessary to give any detailed history of the conflict between the Supreme Court of the United States and the Supreme Court of the State of Iowa, upon bonds of county and municipal corporations issued in payment of the capital stock of railroad corporations.   It is sufficient to state that the Supreme Court of Iowa, since June, 1862, has uniformly, in a great number of cases, held that such bonds are prohibited under the Constitution of the State and are void, *ab initio*, and refuse to enforce them.   The Supreme Court of the United States, since December, 1863, has held that they are valid and binding on the county and municipal corporations, and the courts of the United States have enforced them.   The decision of the United States court is based upon the ground that, prior to June, 1862, the Supreme Court of Iowa recognized the validity of such bonds, and while the Constitution rested upon such interpretation these bonds were issued.   See *Gelpcke et al.* v.

*The City of Dubuque*, 1 Wall. 175.   The United States court has adhered to the ruling in that case.

The Iowa court decided against the validity of these corporation railroad bonds in *The State ex rel. B. & M. R. R. Co.* v. *Wapello Co.* (13 Iowa, 388), and adheres to its ruling thereon.   For a full understanding of the points of difference between the courts see the case of *McClure et al.* v. *Owen et al.*, 26 Iowa, 243.

Presuming that the foregoing statement of facts is sufficient for a correct understanding of the questions of law involved, I will proceed to their consideration.

It is the pride and boast of the American people that no government, present or past, has provided such complete and efficient protection for the personal liberty of the people as our own, and that in no case can a citizen be imprisoned contrary to the law of the land.   Should a citizen be illegally restrained of his liberty, a free, easy, cheap, expeditious and ample remedy is always open to him, whereby the cause of his restraint can be examined by those intrusted with the administration of the law, and, if found to be illegal, the restraint will be removed and the citizen restored to liberty.   The invaluable right of personal liberty, and the means of securing it so carefully provided, are most jealously and vigilantly guarded by the people of this Union.   Their importance and the inestimable blessings which they confer, however highly prized and strongly and sincerely loved, are yet, probably, not fully realized and appreciated by us.   Their value can only be fully realized and estimated by a people who are deprived of them.   Here they are as pervading as the air we breathe, and their constant enjoyment has exempted us from the ill experience of the evils endured by a people deprived of them.

The remedy provided against all illegal restraint of the personal liberty of the citizen is the writ of *habeas corpus.*

That we may the better understand the extent of the jurisdiction and power that may be lawfully exercised under this writ, a brief reference to its history is important.

We derive this great remedy from the common law, a source whence come the precepts and maxims of personal liberty incorporated in the very elements of our laws. From this source we received it, in no dwarfed form, but in its fullest growth and maturity. Being a remedy to secure the liberty of the people, it has rather grown with their growth, becoming equal to the preservation of any new principle of liberty incorporated in our laws. In this form it is preserved and secured by every conceivable guaranty, both constitutional and statutory. In England it is a writ of right, to which every person is entitled, *ex merito justiciæ*, inherent in the English people, existing, probably, before magna charta, and owing its origin to no statute or charter from the king. Hallam's Const. Hist. 500; Hallam's Middle Ages, 342 ; 1 Blacks. Comm. 127. Dr. Johnson said it was always the single advantage which the English government had over that of other countries. It issued as a matter of right, and, under it, the *cause* of the imprisonment of the subject was inquired of. With the protection secured by this remedy, no Englishman could be restrained of his liberty contrary to the law of the land. By it the subject was protected from imprisonment on account of resistance to arbitrary exactions of a despotic king, from all illegal imprisonment without process, and unlawful arrest under color of process.; in short, whenever a subject was unlawfully imprisoned, this writ was the ready remedy for his enlargement.

The remedy under this writ, being a common-law right upon which rested the protection of personal liberty, and being suited and adapted to the wants and condition of this people, was transferred to this country as a part of

the body of the common law.   The courts of this country
unite in holding that the common law, so far as it is
suited to the condition of our people and accords with
our institutions, is the law of the land.   *The Town of
Pawlett* v. *Clark,* 9 Cranch, 333;   *Van Ness* v. *Pacard,*
2 Pet. 144; *Wheaton & Donaldson* v. *Peters,* 8 id. 659 ;
*Wagner* v. *Bissell,* 3 Iowa, 403 ;   *O'Ferrall* v. *Simplot,* 4
id. 402; *State* v. *Twogood,* 7 id. 254.

The existence of this remedy as a right of the people is
recognized by the Constitution of the United States, and
provision is made that the writ shall never be suspended,
except in cases of rebellion or invasion.   Art. 1, § 9.

The ordinance of 1787, for the government of the ter-
ritory northwest of the Ohio river, article 2, provides that
" the inhabitants of said territory shall always be entitled
to the benefits of the writ of *habeas corpus,*" and by the
act of congress of January 11, 1805, section 2, the pro-
visions of this act were extended to the territory of Michi-
gan.   By the act of congress of April 20, 1836, section
12, the provisions of the ordinance of 1787, and all the
rights, privileges and immunities granted to the ter-
ritory of Michigan, were conferred upon the territory of
Wisconsin, of which the territory now constituting the
State of Iowa formed a part.   By section 12 of the act
of June 12, 1838, organizing the territory of Iowa, all
the rights, privileges and immunities granted to the in-
habitants of Wisconsin were extended to the territory
of Iowa.   The Constitution of Iowa of 1846, section 13
of bill of rights, under which the State was admitted into
the Union, secures to the people the benefits of the writ
of *habeas corpus,* and a like provision is embodied in the
Constitution of 1857.

It would seem that this course of congressional legis-
lation, prior to the admission of the State into the Union,
secured to the people of the territory the benefits of this

writ fully and effectually. Whatever may be the character of this legislation, whether it be in the nature of a compact, irrepealable except with the consent of the people of the State, or whether it is superseded, so far as the rights thereby guaranteed are concerned, by the Constitution of the State, which seems to be the doctrine of *Permoli* v. *First Municipality of New Orleans* (3 How. 609) and *Strader* v. *Graham* (10 id. 82), I do not find it necessary here to discuss. It cannot be denied that upon the admission of the State into the Union the people enjoyed this right to its fullest extent. It was in nowise abridged by the State becoming a member of the Union ; it is not surrendered, by virtue of any express provision of the Constitution of the United States, but it is rather guaranteed and preserved by that instrument.

To recapitulate, the writ of *habeas corpus* is secured to the people of the State by the common law, which has been here adopted, by the Constitution of the State, by the Constitution of the United States, and recognized by a long course of congressional legislation, ending with the admission of the State into the Union. Whatever the benefits of this writ may be, they are secured to the fullest extent, and the rights of the people thereto are not wanting in constitutional guarantees and congressional recognition.

I will now inquire into the nature of the right which is thus so well secured. What is the 'writ of *habeas corpus ?* Without adopting the words used in defining it by any one authority, I think the following is in accordance with all. Whenever any person is deprived of his liberty, with or without process of law, unless legally convict or charged in execution, he is entitled to his writ of *habeas corpus.* It is a writ of right, to which every one under the restraint of his liberty is entitled, *ex merito justiciæ,* and upon which the legality of his imprison-

Ex parte Holman.

ment may be inquired into. If illegal, he is discharged; if legal, he is remanded into custody or imprisonment. 1 Kent's Com. 631; 3 Blackstone's Com. 131; 2 Story on Const. § 1339, *et seq.;* Walker's Am. Law, 192.

From this definition we have an idea of the writ as a remedy, and the rights intended to be preserved thereby to all the people of the State. The right to the benefits of this writ is not a barren right; it must be enforced, and while the State cannot abridge or deny it, she may regulate it. And this has been done by ample legislative provisions, empowering certain courts and judges to issue the writ, and prescribing penalties to secure obedience thereto.

It is not limited as a remedy for illegal restraint under particular authority; it is a remedy against *all* illegal imprisonment.

The inquiries to be judicially made, under the writ, are: first, Is the citizen, for whose enlargement it issues, restrained of his liberty? second, Is the restraint *illegal?* If the court or judge to whom the writ is returned stops short of both these inquiries, it is obvious that the citizen, in whose protection it is invoked, does not enjoy the full benefit of the writ to which he is entitled under the Constitutions, both State and federal, and to which, as an American citizen and an heir to the liberty of the common law, he has an inalienable right. If the court or judge, after ascertaining the fact of imprisonment, cannot determine upon its legality, then is the writ a mockery.

No more important duty and binding obligation are imposed upon the State than of guarding and protecting the liberty of the people. To the State alone can the people look for that protection, and well may they expect that it will be faithfully extended to them. The personal liberty of the people is not intrusted to the care of the

federal government. Upon the State government is imposed the power and duty of providing for the full enjoyment of all the absolute rights of individuals. Hence we look to that source alone for legislative enactments governing and preserving the rights of property, and no remedy for a deprivation of these rights is wanting in the State, neither has it been surrendered to the federal government. The fact, that the federal government may, in some cases, exercise the power to enforce these rights, by no means argues that the State has, in such cases, lost that power; it is then simply exercised concurrently by the State and federal governments. This view has never been doubted, for it has never been denied that, when the State courts have jurisdiction of the proper parties and subject-matter of a controversy, they may fully adjudicate upon and determine the rights of those parties and grant the relief provided by law. If, then, the State has the most plenary power to protect the right of property in her citizen, one of his absolute rights, it cannot be possible that another absolute right, personal liberty, esteemed by the law of far greater value, can be, in some cases, taken beyond her protection and guardianship.

It is needless to discuss the question whether congress can, by law, limit the power of State courts under the writ of *habeas corpus ;* no attempt has been made so to do.

It is claimed that the right of the State courts to inquire into the legality of the imprisonment of a citizen, when held under federal authority, is surrendered to the federal goverment by implication, being inconsistent with the full exercise of all the federal powers.

The federal government is one of limited and express powers. The State possesses all attributes of sovereignty, except those conferred upon the federal government. If this limitation upon State authority be necessary in

order to enable the federal government to discharge fully its constitutional powers, I concede that it must be held to exist. But I conclude it is not necessary, and that there are express provisions of the Constitution of the Union conferring power upon the federal Supreme Court, which secures the due administration of the laws of the United States quite effectually, though no such limitation exists. It is not contemplated by the Constitution that the federal government may attempt to discharge its powers by the illegal imprisonment of the citizens of a State, but it is presumed that all of its authority will be exercised in a legal manner. It has the power, in the proper cases, to imprison the citizen. Now, the power to discharge from imprisonment can only be exercised by the State courts when the citizen is *illegally* imprisoned. If he be *legally* imprisoned, under federal authority, the State court cannot discharge, and it is not to be presumed that a State court will attempt to discharge, one so rightfully deprived of his liberty. The presumption must be exercised that both federal and State courts, in such cases, will honestly, faithfully and truly administer the law But should the State court fail so to do, the federal Su-. preme Court can exercise corrective jurisdiction over it. Under the laws of this State an appeal may be taken in a proceeding upon a writ of *habeas corpus* from the decision of a judge at chambers, or the District Court, to the Supreme Court (Rev. § 2631), and the cause may be removed to the United States Supreme Court by writ of error to the State Supreme Court, if the decision of the State court draws in question the validity of a statute or an authority exercised under the United States, and the decision is against the validity.

Thus the exercise of corrective authority by the United States Supreme Court is provided for to the end that, in this proceeding, neither through design nor misapprehen-

sion of the law on the part of the State court, can the rightful exercise of power by the United States government be interfered with. This corrective jurisdiction is conferred upon the United States Supreme Court by express constitutional provision and congressional enactment. I am justified, therefore, in holding that the limitation upon the power of the State court under this writ, as claimed, is not necessary in order to enable the United States government to discharge fully all powers conferred upon it by the Constitution. The argument, therefore, based upon the implied limitation of State power *ex necessitate* fails.

It is argued that the State court cannot, in this proceeding, inquire into the legality of the imprisonment, because that would involve a decision upon the validity of the judgments of the federal courts. This is an untenable position. The validity of the proceedings of every court can be passed upon by every other court in which they are offered as evidence, or as the basis of an adjudication. This is a doctrine too well established to require the citation of authorities in its support, and is of constant application. If the judgment is void for want of jurisdiction, it is a nullity and must be so declared, and no rights can be acquired or power exercised under it. It is also urged that the exercise of this power would require the construction, and probable decision upon the constitutionality of laws of congress. This the State courts have the power to do and continually exercise it. The Constitution and laws of the United States contemplate the exercise of this power on the part of the State courts by providing for writs of error to State courts, from the United States Supreme Court, in cases where decisions are had adversely to the validity of laws of congress, or against the exercise of the authority of the federal government.

I will illustrate this doctrine.   A case is pending in the courts of Iowa involving the title to property.   The claimant of the property is resisted on the ground that his title has been divested by judicial sale, under a judg-ment in a court of the United States.   In support of this defense, a judgment of that court, in due form, is intro-duced in evidence and, under it, a sale, regular in all re-spects, is shown.   To this it is replied that the judgment is void, because the court rendering it did not have juris-diction of the person of the defendant nor of the subject-matter of the suit, or because the law of congress under which the jurisdiction is claimed is in conflict with the Constitution of the United States.   In either case the State court would hold the judgment void and adjudicate upon the rights of the parties accordingly, thus deciding upon the jurisdiction of a federal court, and determining upon the constitutionality of a law of congress.   This same doctrine is applicable in cases involving the liberty of a citizen.

The point I make is this, and now claim nothing more: that where one is held in imprisonment under claim of federal authority, and it appears that such restraint is illegal, because the officer holding him has no power so to do under the law, his authority therefor being based upon a judgment void for want of jurisdiction, the State court under the writ of *habeas corpus* has the power to release from the imprisonment.   But how can this power be ex-ercised if the officer is not required to render obedience to the writ by producing the plaintiff and showing the cause of his confinement?   I see no escape from the con-clusion that the officer must submit to the authority of the court issuing the writ.

That I may be distinctly understood, I will, at the risk of repetition, state here the grounds upon which my conclusion is based.   The right to the benefits of the

writ of *habeas corpus* is inherent in the people of this State, and the power to secure that right in *all* cases rests in the State. It has not been surrendered to the federal government by express grant in the Constitution of the United States, neither is it surrendered by implication, for its limitation is not necessary to enable the federal government to discharge fully all its lawful powers. Admitting, however, that congress may assume exclusive jurisdiction in cases under this writ arising out of the exercise of authority of the federal government, it has, in no manner, attempted so to do. The congressional legislation upon this subject has afforded an opportunity for the exercise of that power, if it exists, but it has been carefully withheld. No one conversant with the feelings of the people of this Union will suppose that their representatives in congress, at any time, would have consented to the assumption of that power by congressional enactment. Having never been assumed by congress, the power of the State remains unlimited, for it is a well-established doctrine, that powers of which the federal government may assume the exclusive exercise remain in the State until taken away by congressional enactment.

It is insisted, upon the authority of *Ableman* v. *Booth* (21 How. 506), that in this case, where citizens of the State are restrained of their liberty under federal authority, I have no power to inquire into the cause of such restraint, and to enlarge them if the restraint be found illegal.

The doctrine of *Ableman* v. *Booth* is based, in my opinion, upon an unjust doubt of the loyalty and affection on the part of the States toward the federal government, and an unwarranted fear of encroachment upon its constitutional authority, arising, probably, from a misconception of the very nature of the State and federal

governments. The doctrine of that case is fully expressed in the following extracts from the opinion of Chief Justice TANEY:

"And although the State of Wisconsin is sovereign within its territorial limits, to a certain extent, yet that sovereignty is limited and restricted by the Constitution of the United States. And the powers of the general government and of the States, although both exist and are exercised within the same territorial limits, are yet *separate and distinct sovereignties* acting separately and independent of each other, within their respective spheres. And the sphere of action appropriated to the United States is as far beyond the reach of the judicial process issued by a State judge or a State court, as if the line of division was traced by landmarks and monuments visible to the eye. And the State of Wisconsin had no more power to authorize these proceedings of its judges and courts than it would have had if the prisoner had been confined in Michigan, or in any other State of the Union, for an offense against the laws of the State in which he was imprisoned.

\* \* \* \* \* \* \*

"This right to inquire by process of *habeas corpus* and the duty of the officer to make a return, grows, necessarily, out of the complex character of our government, and the existence of *two distinct and separate sovereignties* within the same territorial space, each of them restricted in its powers, and each within its sphere of action, prescribed by the Constitution of the United States, independent of the other. But after the return is made, and the State judge or court judicially apprised that the party is in custody under the authority of the United States, they can proceed no further.

"They then know that the prisoner is within the dominion and jurisdiction of *another government*, and

that neither the writ of *habeas corpus*, nor any other process issued under State authority, can pass over the line of division between the two sovereignties. He is then within the dominion and exclusive jurisdiction of the United States. If he has committed an offense against their laws, their tribunals alone can punish him; if he is wrongfully imprisoned, their judicial tribunals can release him and afford him redress." 21 How. 516, 223.

Here we have a picture of "*two distinct and separate sovereignties within the same territorial space*," the citizen owing to each a separate allegiance, being a citizen of "*two separate sovereignties*." These "*two distinct and separate sovereignties*" may claim conflicting duties from this dual citizen, with the result, as clearly indicated in the opinion, that the stronger government must prevail in enforcing its authority. The doctrine raises the idea of conflict, and the history of late years has given sad proof of its tendency.

I will turn to another theory of our State and federal governments, anounced by Alexander Hamilton, and approved by Chief Justice MARSHALL and Judge STORY:

"I mean not, therefore, to contend that the United States, in the course of legislation upon the objects intrusted to their direction, may not commit the decision of causes arising upon a particular regulation to the federal courts solely, if such a measure should be deemed expedient; but I hold that the State courts will be divested of no part of their primitive jurisdiction further than may relate to an appeal; and I am even of opinion that in every case in which they are not expressly excluded by the future acts of the national legislature, they will, of course, take cognizance of the cause to which those acts may give birth. This I infer from the nature of judiciary power, and from the general genius of the system. The judiciary power of every government looks beyond its

own local or municipal laws, and in civil cases lays hold of all subjects of litigation between parties within its jurisdiction, though the causes of dispute are relative to the laws of the most distant part of the globe. Those of Japan, not less than of New York, may furnish the objects of legal discussion to our courts. When, in addition to this, we consider the State governments and the national governments, as they truly are, in the light of kindred systems, and as parts of ONE WHOLE, the inference seems to be conclusive that the State courts would have a concurrent jurisdiction in all cases arising under the laws of the Union where it was not expressly prohibited.

" Here another question occurs: what relation would subsist between the national and State courts in these instances of concurrent jurisdiction? I answer, that an appeal would certainly lie from the latter to the Supreme Court of the United States. The Constitution, in direct terms, gives an appellate jurisdiction to the Supreme Court in all the enumerated cases of federal cognizance in which it is not to have an original one, without a single expression to confine its operation to the inferior federal courts. The objects of appeal, not the tribunals from which it is to be made, are alone contemplated. From this circumstance, and from the reason of the thing, it ought to be construed to extend to the State tribunals. Either this must be the case, or the local courts must be excluded from a concurrent jurisdiction in matters of national concern, else the judiciary authority of the Union may be eluded at the pleasure of every plaintiff or prosecutor. Neither of these consequences ought, without evident necessity, to be involved; the latter would be entirely inadmissible, as it would defeat some of the most important and avowed purposes of the proposed government, and would essentially embarrass its measures. Nor do I perceive any foundation for such a proposition.

Agreeably to the remark already made, the national and State systems are to be regarded as ONE WHOLE. The courts of the latter will, of course, be natural auxiliaries to the execution of the laws of the Union, and an appeal from them will as naturally lie to that tribunal, which is destined to unite and assimilate the principles of national justice and the rules of national decision." Federalist, No. 82, p. 379.

The doctrine thus announced by Hamilton is fully approved by Chief Justice MARSHALL in *Cohens* v. *Virginia* (6 Wheat. 413), and by Judge STORY in his Commentaries on the Constitution (vol. 2, § 1752), each quoting at length the above extract from the Federalist.

Here we have a view of ONE government, homogenous in all its parts, the citizen owing but ONE allegiance, and having no conflicting duties or adverse interests; ONE great nationality, perpetual in its existence and beneficent in the exercise of its authority. The administration of the laws of these two governments united in one, as it appertains to each, is by the federal or State judiciary, with an appellate and corrective jurisdiction resting in the Supreme Court of the United States in all cases involving the exercise of federal authority or the construction of the laws or Constitution of the United States. How harmonious and beautiful this government in design; how simple in its constitution and how readily comprehended; how efficient in its operation and how promotive of union and harmony! A fit government for a free, intelligent and mighty people!

The very case of *Ableman* v. *Booth* illustrates the fact that the fears expressed in the opinion of Chief Justice TANEY, of the effect of local prejudice and interest in producing encroachments upon federal authority, are not well founded. The jurisdiction assumed by the Wisconsin court in that case was utterly denied by the United States

Supreme Court, and held to be an unwarranted assumption of authority on the part of the State court. Yet, as the very case shows, there was no difficulty in bringing it before the Supreme Court of the United States for review, and usurpation, if attempted, was arrested. While the assumption of unwarranted power on the part of the State court cannot be too strongly condemned, its attempt by the Wisconsin court, if such it were, was not so dangerous to the principles of our government as the doctrine upon which it was resisted by the federal Supreme Court. In the protection of liberty the Wisconsin court sought to extend its power; it was resisted by the federal Supreme Court under a doctrine which is in derogation of the rights of the citizen to the benefits of a remedy for the protection of his liberty, as old as the common law, and secured by every conceivable constitutional and statutory guaranty, a doctrine that is a most dangerous encroachment upon the rightful jurisdiction of the State judiciary.

According to the view of Hamilton, Marshall and Story, this is ONE government, ONE people; and, under the federal Constitution, in all cases where the exercise of federal authority is called in question by the State judiciary, the United States Supreme Court is the final arbiter. Therefore, no sound reason can be given for denying to the State courts concurrent jurisdiction of writs of *habeas corpus*, where citizens are imprisoned under federal authority. There can be no ground of jealousy, or fear of encroachment, by the State courts, upon the rightful exercise of federal authority, for certainly the presumption, as in all other cases, ought to be exercised, that the State courts will correctly administer the law. They are a constituent part of the judiciary of the country; it cannot be presumed that they are controlled by interests in conflict with the proper exercise of federal power. But if it should so be found, their judgments are subject to

review by the United States Supreme Court, as the judgments of inferior federal courts, and with the same effect.

The decision of *Ableman* v. *Booth* did not necessarily involve the doctrine upon which it is planted. The federal Supreme Court, in determining that the judgment of the Wisconsin court drew in question the validity of a statute of, and an authority exercised under, the United States, and that the decision thereon was against their validity, had jurisdiction of the case. There were points in the case which demanded its reversal. But the court passed by all these, and, in the decision, struck down the jurisdiction of the State court to grant relief, under the writ of *habeas corpus*, to citizens imprisoned by federal authority, oppressively and illegally exercised, under the judgment of a court void for want of jurisdiction.

The doctrine of that case, as well as the reasoning upon which it is sustained, in my opinion is inconsistent, or leads to inconsistent results. It is embodied in the following extracts: "We do not question the authority of a State court, or judge, who is authorized by the laws of the State to issue the writ of *habeas corpus*, to issue it in any case when the party is imprisoned within its territorial limits, provided it does not appear, when the application is made, that the person imprisoned is in custody under authority of the United States. *The court or judge has a right to inquire, in this mode of proceeding, for what* CAUSE *and by what authority the prisoner is confined within the territorial limits of the State sovereignty.* And it is the duty of the marshal, or other person, having the custody of the prisoner, to make known to the judge or court, by proper return, the authority by which he holds him in custody. *  *  But after the return is made, and the State judge or court judicially apprised that the party is in custody under the United States, they can proceed no further."

Here it is announced in one sentence that the State court or judge has no authority to issue the writ in cases where the plaintiff is in confinement under the authority of the United States.  In another sentence it is laid down with equal explicitness that it is the right of a State court or judge by *habeas corpus* to inquire into the *cause* of the imprisonment of any citizen within the territorial limits of the State.  If the judge may, as he is bound by his duty to do — for the right to exercise the power imposes the duty to discharge it in proper cases — inquire into the cause of imprisonment, and finds that it is without cause, or for a cause which, under the law, does not justify it; that it is upon the process of a court having no jurisdiction of the person of the citizen or of the offense with which he is charged; that the whole proceeding authorizing the imprisonment is in violation of the Constitution and the law, both State and federal, if, I say, under these circumstances, the court or judge issuing the writ has not power to give relief, the proceeding is a mockery.  It serves no other purpose than to bring to the judicial knowledge of the judge the fact of oppression, of violation of law, of rights, esteemed the most sacred, trampled upon, while he possesses no power to grant relief.  Such doctrine is inconsistent with every principle of law and reason.  The inconsistency exhibited in the above quotations is most apparent, and illustrates the fact how even a great mind may be at fault in the support of an erroneous doctrine.

Judicial decisions must be considered in the light of history, and the causes producing them and the concomitant facts and circumstances must be well weighed in determining their authority.  I know of no reason why the decisions of the United States Supreme Court should be excepted from this rule, nor will the high respect which I entertain for that court justify me in forbearing

to apply it to *Ableman* v. *Booth*. That case was decided when the institution of slavery controlled this government, when it was in the height of its power and had assumed its most aggressive character. The judiciary, and other departments of the government, were alike subject to its influence. The decision in that case, with others of the Supreme Court of the United States, and certain congressional enactments, were designed to nationalize and propagate the institution, to open the States and territories to the traffic in human beings as chattels, and to give the master, by a summary proceeding under the most stringent and cruel law, the right to capture his slave wherever found in the free States of the Union.

The Constitution of the State of Mississippi, by express words, forbade the introduction of slaves into that State as merchandise. In *Groves* v. *Slaughter* (15 Pet. 449), the United States Supreme Court held that this positive prohibition was simply directory to the legislature, and not operative without legislative enactment. The Supreme Court of Mississippi, by subsequent adjudications, held that the provision of the Constitution referred to operated as a prohibition upon the importation of slaves as merchandise without the aid of laws to that effect. In *Rowan* v. *Runnels* (5 How. 138), the United States Supreme Court disregarded these adjudications of the Mississippi court giving force and effect to this constitutional prohibition of an inhuman traffic, and adhered to the former ruling. The Kansas-Nebraska act of 1854 opened free territory of the Union to slavery. In *Dred Scott* v. *Sanford* (19 How. 396), decided in 1856, the Supreme Court went a step further and opened *all* the territories to the institution. The fugitive slave law of 1850 was harsh and cruel in the extreme. It provided that the question of liberty of a human being should be determined without a jury, before a mere commissioner appointed

to take depositions, etc., who was clothed with plenary power in the premises, and was paid, in case he declared the alleged fugitive to be a slave, twice the amount he could lawfully receive in case he found him to be a free man. This law was sustained by the Supreme Court of the United States. And here this controlling power in our government at that time, the institution of slavery, demanded recognition of the doctrine of *Ableman* v. *Booth*. The harsh provisions of the fugitive slave law of 1850 were repulsive to the people of the free States, and a strong sentiment against the institution of slavery itself was growing up among them. By stripping the State courts and judges of jurisdiction, under the writ of *habeas corpus*, to inquire into the cause of the imprisonment of those held under federal authority, an impediment, as it was supposed, to the summary execution of the law would be removed. It will be remarked that *Ableman* v. *Booth*, as well as other cases in the federal courts in accord with it, hereafter referred to, all grew out of the execution of the fugitive slave law. The doctrine of that case should die with the institution whose demands called it into existence. As we now remember with regret the legislation of congress, and the decisions of the United States Supreme Court, prompted by its aggressive spirit, they should all, the fugitive slave law, the Kansas-Nebraska act, *Rowan* v. *Runnels*, *Dred Scott* v. *Sanford*, and *Ableman* v. *Booth*, be forgotten together.

I have examined, with all the care the brief time given for the preparation of this opinion will permit, the discussions upon the power of the federal government, as conferred by the Constitution, contained in Elliot's Debates and the Federalist, and I do not find that it was anywhere claimed, by the friends or opponents of the instrument, that the State courts are, by that instrument, stripped of the power to relieve against unlawful impris-

onment under federal authority, and I do not find any fears expressed by those who were unfriendly to the Constitution that any such claim or assumption of power would ever be made by the federal courts. At that time, the people were even more jealous and watchful of their liberties than at this, for the experience of oppressions incident to arbitrary arrests were fresh in their minds, and encroachments upon their liberties and other absolute rights which they had possessed under the English Constitution, were, from the time of Charles I, the cause of frequent contests between the people and the government, both in the mother country and the colonies. It is not possible it could have been imagined at that time that the right to the benefits of *habeas corpus*, as it then existed in the States, was in any way abridged by the Constitution. Indications of such views would have appeared, in some shape, from the opponents of the instrument.

I will now proceed to refer briefly to the adjudications of the federal and State courts upon this question. I will not pretend to enter into an examination of the cases or a discussion of the principles announced in them. I have not the time to do so, nor do I know that it would be profitable.

The question has not been directly before the United States Supreme Court, except in the case of *Ableman* v *Booth*. I learn from text-books that it has been determined in some of the United States Circuit and District Courts in favor of the exercise of the power by the State courts. I have not, however, seen reports of such cases. I have been referred to but two cases where the United States Circuit Courts denied the power. One was a case in the Circuit Court for the Southern District of New York, before Mr. Justice NELSON, who, in his charge to the grand jury, announced doctrines identical with those

in *Ableman* v. *Booth.* I have seen no more of the charge than is contained in Hurd on Habeas Corpus, 198, 199. The other case referred to as supporting the same doctrine is *Norris* v. *Newton*, 5 McLean, 92. In my opinion, the views of Mr. Justice McLEAN as therein expressed are entirely accordant with the exercise of the power by the State courts to the full extent claimed. He says: "I have no hesitation in saying that the judicial officers of a State, under its own laws, in a case where an unlawful imprisonment is shown by one or more affidavits, may issue a writ of *habeas corpus* and inquire into the cause of detention. But this is a special and limited jurisdiction. If the plaintiff, in the recapture of his fugitive slaves, had proceeded under the act of congress, and made proof of his claim before some judicial officer of Michigan, and procured the certificate which authorized him to take the fugitives to Kentucky, these facts, being stated as the cause of detention, would have terminated the jurisdiction of the judge under the writ. Thus it would appear that the negroes were held under federal authority, which, in this respect, is paramount to that of the State. The cause of detention being legal, no judge could arrest and revise the remedial proceeding of the master." * * "The fugitives were in the legal custody of the master, a custody authorized by the Constitution and sanctioned by the Supreme Court of the Union." * * "The legal custody of the fugitives by the master being admitted, as stated in the return on the *habeas corpus*, every step taken subsequently was against law and in violation of right."

Now, Mr. Justice McLEAN does not arrest the jurisdiction of the State courts because the plaintiffs were held under authority of the United States, but because they were in *legal custody;* that is, the cause of their detention was legal. No one can understand this learned

judge to say that if the plaintiffs were held under authority of the United States, without *legal cause, against law and right*, so that they were not in *legal* custody, and that upon such fact appearing the jurisdiction of the State court would cease. To illustrate his precise meaning, I will state a case. I issue a writ of *habeas corpus;* the plaintiff is brought before me, and the return shows that he was indicted by a grand jury of the district court of this county for grand larceny. Thereupon my jurisdiction ends, because the restraint is legal. But suppose the return discloses that he is indicted for treason against the United States. The restraint is therefore illegal, because the grand jury had no jurisdiction to find the bill, and. my jurisdiction is not thereby terminated. Take another case. The return to the writ shows that the plaintiff is restrained by the United States marshal, upon an indictment found by a grand jury of the United States District Court of Iowa, for treason against the United States. I have no right to question the action of a grand jury when it possesses jurisdiction, and I remand the plaintiff. But, if the return shows that he is held upon an indictment for obstructing a State highway, I have jurisdiction to discharge him, for the United States grand jury has no jurisdiction of that offense. Mr. Justice McLean is not to be understood as intimating that, upon the return showing that the plaintiff is in the custody of a United States officer, the State court has no authority to inquire whether the restraint be legal, and if illegal to discharge the plaintiff. The authority is very far from sustaining the doctrine which excludes the power of the State courts, if in fact it does not sustain their power.

The question has been considered in this State. In the case of *Ex parte Anderson* (16 Iowa, 598), Mr. Justice Dillon held that the State courts have concurrent juris-

diction with the federal courts to inquire into the validity of enlistments in the army of the United States, and distinctly stated that he would, in a proper case, exercise it. This case was well considered, and General Roberts, the commander of the military district of Iowa, an officer of distinction, long in the military service of the United States, and known to be a lawyer of ability, while not conceding the jurisdiction of the State court, distinctly disclaimed questioning it.

In New Hampshire the power is distinctly claimed and has been exercised. *The State* v. *Dimick*, 12 N. H. 197. So in Massachusetts in repeated instances. *The Commonwealth* v. *Harrison*, 11 Mass. 63 ; *The Same* v. *Cushing*, id. 67 ; *The Same* v. *Chandler*, id. 83 ; *The Same* v. *Downs*, 24 Pick. 227 ; *Sim's Case*, 7 Cush. 285. So in Pennsylvania. *Olmsted's Case*, Bright. 9 ; *Lockington's Case*, id. 269 ; *Commonwealth* v. *Fox*, 7 Barr. 336 ; *Same* v. *Murray*, 4 Binn. 487 ; *Same* v. *Gamble*, 11 Serg. and Rawle, 93. In Ohio it has been exercised and never doubted. *In re Dessinger*, 12 Ohio, N. S. 257 ; *Ex parte Bushnell*, 9 id. 77. And in Indiana. *Wanthlan* v. *White*, 19 Ind. 470. So in Connecticut. *Lanahan* v. *Birge*, 30 Conn. 439. And in Wisconsin. *In re Conway and Gibbons*, 17 Wis. 528 ; *In re Garvin*, 16 id. 430 ; *In re Gregg*, 15 id. 479. In New York the power was recognized in 1812, though doubted by Chief Justice KENT; but in 1813 was fully claimed and exercised, and that great judge seemed to have fully concurred in its exercise. He announced the opinion of the court, ordering an attachment to issue for the arrest of General Lewis, in command of United States troops, who failed to produce the body of one for whose enlargement the writ issued. See *Matter of Ferguson*, 9 Johns. 239 ; *Matter of Stacy*, 10 id. 328 ; 1 Kent's Com. 401 ; *Carlton's Case*, 7 Cow. 471 ; *United States* v. *Wingate*, 5 Hill, 16. In 1863 Mr. Jus-

tice BACON, in *In re Hopson* (40 Barb. 34), and Mr. Justice SMITH, in *Jordan's Case* (2 Law Reg. N. S. 748), (both cases at chambers), followed *Ableman* v. *Booth;* but, subsequently, in the Supreme Court, Mr. Justice LEON-ARD affirmed the jurisdiction of the State courts. In *Matter of Barrett*, 42 Barb. 479. It was claimed and exercised in Virginia, Maryland and South Carolina as early as 1813. See 1 Kent's Com. 401, and notes; Hurd's Habeas Corpus, 170, 189, 192; Wharton's Am. Crim. Law, 195, and notes. So in Georgia in 1808. *The State* v. *Wederstrandt*, T. U. P. Charl. 213. Prior to this it had been disclaimed in Georgia, and was subsequently denied in South Carolina.

It was distinctly asserted, and sustained upon satisfactory grounds, in New Jersey, in 1819. *The State* v. *Briarly*, 2 South. 555. The question was considered in another case in that State in 1862. *The State* v. *Zulich* (5 Dutcher, 412), before Mr. Justice OGDEN at chambers, was a case where one in the military service of the United States was under arrest on a charge of desertion. The learned justice discusses to some extent the power of the State courts, cites *Ableman* v. *Booth* without appro al, and observes that the United States courts of the different States " having complete, if not exclusive, jurisdiction over such subject-matters by the use of the writ of *habeas corpus* and otherwise," the rights of the citizen cannot be abridged by turning him over to the federal judicial power, and on account of the condition of the country, in some States, "lax views might prevail respecting the importance of maintaining the integrity of our arms in. the existing national difficulty," he "should decidedly incline to leave the petitioner to the action of the federal tribunals." But he declines to exercise the authority on the writ " because the prisoner is in custody for a crime, by an arrest through competent authority." In Michi-

gan the jurisdiction is denied. In *In re Spangler* (11 Mich. 298), three of the justices adopt the doctrine of *Ableman* v. *Booth;* the other one does not find it necessary to meet the question in arriving at a conclusion in the case.

We find the jurisdiction claimed and exercised in thirteen States, denied in one — one State with conflicting decisions, the last one against it — another having conflicting decisions, the more recent one in its support. Such is the course of decisions in the State courts. In my opinion in adjudications upon no important legal or constitutional question, can be found more harmony. It rarely happens that upon debatable questions the current of authorities are so completely in accord. Must I shut my eyes to this long array of precedents, close my ears to the arguments in their support, and deny, against the convictions of my reason, the fundamental principles upon which they are well supported, to adopt a doctrine which I sincerely believe may result in the most disastrous consequences to the liberties of the people? Shall I permit the judiciary of the State to be shorn of any portion of the power which it rightfully possesses to relieve the people from *all* illegal imprisonment, upon the authority of one decision of the United States Supreme Court, feebly supported, if it can be said to be supported at all? I know of no principle of law which requires this of me.

While I entertain the highest respect for the tribunal in which the doctrine was announced, I claim the lawful right to exercise certain freedom of thought that will justify me in denying doctrines which, to me, seem erroneous and pernicious, though they are taught by that court. I will only give the doctrine of *Ableman* v. *Booth* my judicial sanction when it is taught me by a *procedendo*. Then, as in duty bound, I will follow it, but until I

obtain new light, it can never have the sanction of my reason. But I have the fullest confidence that, upon a review of the grounds upon which it is based, the decision in that case will be overruled by the federal Supreme Court.

Many of the decisions above cited supporting the jurisdiction of the State courts were rendered in cases where persons were held by the military officers of the government. I have not observed in the books an attempt to point out any distinction in principle between such cases and those where the restraint is by virtue of civil process. The learned counsel for defendant made such a distinction in this, that courts had the right to determine, judicially, upon their own jurisdiction, and a military officer could not determine judicially as to his power, and he insisted, that as one court is bound by the judicial determination of another, so is it bound by such determinations relating to jurisdiction. The argument is ingenious but not sound, as its conclusion is not admissible. It is true that a court has the power to determine all questions relating to its jurisdiction. But it is equally true that, if it assumes jurisdiction upon such determination, which it, in fact, does not possess, its judgment in such a case is void, and all other courts before which that judgment is brought, for any purpose, may determine the question of its jurisdiction.

It is urged that, in some States, no provision is made for the review by the highest court of the decisions of the judge or court issuing the writ of *habeas corpus*, so that the United States Supreme Court cannot obtain jurisdiction in such cases. Whether the law of any State be so I know not, for I have not had time to examine the statutes of all. In some States I know the law to be otherwise, and it is presumed that, in all, some proceedings are known whereby the decision of a judge or inferior court, upon

*habeas corpus,* may be brought up for review in the highest courts. But, be that as it may, it is no objection to the exercise of the jurisdiction by the State courts ; it is an argument to be addressed to congress and the State legislatures for proper legislation in the premises.

It is also urged, with earnestness, that the citizen will not be deprived of the benefits of the writ by denying jurisdiction thereof to the State courts, in cases where he is restrained under federal authority. In such cases the federal courts are open to him. As we have seen, the remedy under this writ must be free, easy, cheap and expeditious. To clothe the federal courts and judges with exclusive jurisdiction in such cases, would often operate as a practical denial of the remedy, and would, in all cases, deprive it of these qualities. In almost every county in this State federal officers may be found with power to arrest the citizen, and this may be often illegally done. Two federal judges, residents of the State, have jurisdiction to issue the writ of *habeas corpus.* One of these, the eminent justice of the Supreme Court, is required by his judicial duties to be in the federal capital, or is holding courts upon his circuit for the greater part of the time. The district judge resides in the Southern part of the State. Citizens arrested in many parts of the State could only have the benefit of the writ issued by a judge, to be found several hundred miles away. This free, easy, cheap and expeditious remedy would thus be practically denied.

While I recognize the jurisdiction as inherent in the State courts, and to no extent surrendered by the Constitution, it should be carefully and cautiously ·exercised. While I insist that, in administering justice, I may, nay must, declare any law of congress invalid that conflicts with the federal Constitution, yet I would not exercise the power except in the clearest case. If a doubt existed

in my mind I would give the benefit of that doubt to the law, and sustain it. The law must be palpably, clearly and indisputably unconstitutional to justify me in holding it void. I would hesitate longer, and require a clearer case, than when dealing with a State law. So, when called upon to determine the jurisdiction of a federal court, either as to the subject-matter or persons before it, I must be satisfied, in the clearest manner, that jurisdiction is wanting before I will so hold. I will give the benefit of all presumptions which the law will permit me to exercise in favor of its existence. I will discharge the duty carefully and cautiously, but if I am satisfied that jurisdiction is wanting I will treat the judgment as a nullity.

It is urged by defendant's counsel, with great earnestness, that the plaintiffs, being under arrest for a contempt, upon a writ of attachment, issued by a court of competent authority to punish for contempts, I have no jurisdiction to inquire into the legality of such arrest. I may admit that I cannot inquire into the regularity of the proceedings upon which the writ issues, the sufficiency of the acts charged to constitute a contempt, nor, in fact, into any thing short of the jurisdiction of the court over the persons of the plaintiffs or the subject-matter of the proceedings wherein the writ issues. But I hold that, if the United States Circuit Court has no jurisdiction of the mandamus case, or of the persons of plaintiffs, all its orders and judgments whereon the writ issued, and the writ itself, are void, and the jurisdictional questions may be considered under the writ of *habeas corpus.* I do not understand that there is any conflict of authorities upon this question.

In *Passmore Williamson's Case* (26 Penn. St. [2 Casey] 18), well known to the profession, and remembered by the public, Mr. Justice BLACK uses the following lan-

guage : " It is certainly true that a void judgment may be regarded as no judgment at all; and every judgment is void which clearly appears on its face to have been pronounced by a court having no jurisdiction or authority in the subject-matter. For instance, if a federal court should convict and sentence a citizen for libel; or if a State court, having no jurisdiction except in civil pleas, should try an indictment for a crime, and convict the party ; in these cases the judgment would be wholly void. If the petitioner can bring himself within this principle then there is no judgment against him ; he is wrongfully imprisoned, and we must order him to be brought out and discharged."

It will be remembered that this was an application for a writ of *habeas corpus* by one who had been committed for a contempt of a United States court, and the writ was refused because it appeared that the court committing him had jurisdiction. The learned justice must not be understood to mean that want of jurisdiction can *only* be shown by the face of the judgment itself. It may be shown by the record, and, in some cases, I conceive could be shown by matter *dehors* the record. As in the case where courts having concurrent jurisdiction, the one first acquiring jurisdiction retains it to the exclusion of the other, the fact of the acquisition of jurisdiction by the first court may, nay, must, in most instances, be shown by its own record. In *Ex parte Kearney* (7 Wheat. 44), Mr. Justice STORY, citing *Brass Crosby's Case* (3 Wilson, 188), remarks, " that a writ of *habeas corpus* was not deemed a proper remedy when a party was committed for a contempt by a court of *competent jurisdiction*," and this was the precise point decided in that case. But it is not to be understood that the judgment of a court having jurisdiction generally to punish for contempts may not be held void for want of competent jurisdiction

in the particular case wherein it attempts to exercise the power. Lord ELLENBOROUGH, in *Burdett* v. *Abbott* (14 East, 69, 70, 2 Am. ed. vol. 7, p. 358), commenting upon *Brass Crosby's* and other like cases, observes: "But if the judges before whom those applications were made on writs of *habeas corpus*, had felt that the houses had no pretense of power to commit, or had seen upon the face of the returns that they had exercised it in those cases extravagantly and beyond all bounds of reason and law, would they not have been wanting in their duty if they had not looked into the causes of commitment stated? and would it have been an excuse for a most imperfect discharge of their important duty upon the writ of *habeas corpus* to say, that, though they remand the prisoner, he had his remedy by action, if the case were that he ought never to have been committed at all?" He observes, in reply to the question, that "it would be the greatest slander on the administration of the laws of England to say that those who were called upon to administer it on those occasions would have done so." The commitments in those cases were by the house of commons, and his lordship admits its power, in proper cases of contempt, to imprison an English subject.

The doctrine I have attempted to advance here is well supported by other authorities. Want of time forbids me to comment upon them. I will content myself by a mere reference thereto: *Burnham* v. *Morrissey*, 14 Gray, 238; *The People* v. *Hackley*, 24 N. Y. 77; *In re Morton*, 10 Mich. 208; *Bradley* v. *Veazil*, 47 Maine, 85; *State* v. *Fowle*, 42 N. H. 541.

The opinion in the case last cited contains reference to a large number of authorities, not one of which, so far as I have been able to examine them — some not being accessible — sustains the point made by defendant's counsel.

Satisfied of my jurisdiction to examine into the cause of the imprisonment of the plaintiffs, and to enlarge or remand them, as the law requires, I will proceed to discharge that duty.

It is claimed by plaintiffs that their imprisonment is illegal because the process upon which they are detained is issued upon a judgment or order which, it is insisted, is void, because the United States Circuit Court of Illinois had jurisdiction of neither the persons of plaintiffs nor the subject-matter upon which that court adjudicated in the proceeding upon which this writ was issued.

In support of this position, it is first insisted that, without looking back of the institution of the mandamus proceeding, the federal court has, as shown by the record thereof, no jurisdiction. It is argued that the mandamus proceeding is a new, separate and distinct suit, in which that court could acquire jurisdiction only on the same conditions of residence of the parties as in any other suits. That, inasmuch as the record of that proceeding shows that the plaintiffs are residents of Iowa, the court had no jurisdiction of their persons, and could acquire none, even by appearance and consent. Let us inquire as to the nature and office of mandamus. The term expresses two ideas, or rather is used to describe two things: 1st. The process called by the name; 2d. The proceedings wherein that process issues. A summons issues in an action of assumpsit; a *fieri facias* and other writs issue upon the judgment in assumpsit. The proceeding in court is called assumpsit; the writs, original or final, have other and different names. But in this proceeding of mandamus the name *mandamus* describes the proceeding, and also the process, both original and final. The original process is an alternative writ of mandamus; the final process is a peremptory writ. Now there ought certainly to be no difficulty or confusion in using this word

mandamus. There are other words in the law, and in common use, that are used to describe two things; but, by referring to the context, we never have trouble in understanding them when used. We have quo warranto and replevin, words used much in the same manner. Now, is the proceeding of mandamus an action? There can be no doubt that it is. The United States Supreme Court says: "That the proceeding on mandamus is a case within the meaning of the act of congress has been too often recognized in this court to require any particular notice. It is an action or suit brought in a court of justice, asserting a right; and is prosecuted according to the forms of judicial proceedings." *Kendall* v. *United States*, 12 Pet. 615; see also *Same* v. *Same*, 3 How. 100; *Kentucky* v. *Denison*, 24 id. 97. But *Riggs* v. *Johnson County* (6 Wallace, 198) is cited to sustain the position that it is not a suit, but a process. Mr. Justice CLIFFORD, in that case, for the majority of the court, says: * * "the Circuit Courts in the several States may issue the writ of mandamus in a proper case, when it is necessary to the exercise of their respective jurisdictions, agreeably to the principles and usages of law. When such an exigency arises, they may issue it, but when so employed, it is neither a prerogative writ nor a new suit, in the jurisdictional sense. On the contrary, it is a proceeding ancillary to the judgment which gives the jurisdiction, and when issued becomes the substitute for the ordinary process of execution to enforce the payment of the same, as provided in the contract." Here is a statement that a *writ* does not become a *new suit* — quite an evident proposition; but then it is stated that this proceeding is *issued* and becomes process — more difficult to be understood. The confusion and unintelligibility of the quotation all result from the indiscriminate use of the word "mandamus," without reference to its double meaning as above stated.

The proceeding of mandamus may be ancillary to, that is, "subservient, subordinate to" another suit. and still be a suit, and a new suit. There are many ancillary suits that are separate and distinct actions. A proceeding upon a creditor's bill may be an ancillary proceeding to an action at law. Yet it is a suit, a new suit and in another forum. It can hardly be admitted, that this decision, announced by a bare majority of the court, will overrule all the prior adjudications of that court, to the effect that a proceeding of mandamus is an action, and settle the law to be that *the action is only process.*

The record in the mandamus action discloses the fact that the defendants therein (plaintiffs herein) are citizens of Iowa and plaintiff is a citizen of Pennsylvania. Now, to give jurisdiction to the United States Circuit Court the defendant must be an inhabitant of the district in which the circuit is held. Judiciary Act, 1789, § 11. But the defendant appeared and answered. It is uniformly held by the United States Supreme Court that in the federal courts, being of special and limited jurisdiction, consent cannot give jurisdiction. See *Capron v. Van-Noorden*, 2 Cranch. 126 ; *Jackson v. Ashton*, 8 Pet. 148.

Now, were the question *res integra* I could have no doubt that the Circuit Court had no jurisdiction in the mandamus case, because the defendants were not inhabitants of the proper district. But under the authority of *Randall v. Howard* (2 Black, 589), and *Minnesota Co. v. St. Paul Co.* (2 Wallace, 632), I do entertain doubts upon that point, though I conceive this case is readily distinguishable from those, and in ordinary cases, where the question of jurisdiction comes up in a different form, I would so hold, and not follow those cases. Therefore, applying the principle above announced, that the want of jurisdiction should be made clearly to appear, I am content to hold against the objection.

Keeping in view the facts of the case, I approach the consideration of another jurisdictional question, viz. : Did the United States Circuit Court have jurisdiction of the subject-matter of the mandamus action? We must first have a clear understanding of what is meant by the term, *subject-matter of an action*. It is that over which the court is required to exercise its power. It may be a thing, an act, a right, a duty, or a power, or it may be a combination of two or more of them. Thus, in an action to recover the possession of property, the property, the *res*, the title to the property, the *jus*, constitute the subject-matter of the action. In an action to recover a debt the right of plaintiff to recover from defendant the amount of money, and the correlative duty of defendant to pay it, constitute the subject-matter, which is expressed in one word, the *debt*. This action of mandamus is a proceeding requiring an officer or other person to do some particular act which appertains to his *office and duty*.

Now, let us inquire what is the subject-matter of the action in this case. It consists of the following : first, the act of levying the tax ; second, the duty of the supervisors to levy the tax. Of the first, nothing need be said ; it is understood by a simple statement. As to the *duty* something more must be said. It is dependent upon the power to do the act. If there is no power in the supervisors to levy the tax, there can be no duty resting upon them to do so. It also depends upon its correlative, the right of some one to require the tax to be levied. And as this is a *public duty*, a *trust duty*, which, if discharged, may affect the property of others, the rights of these other parties stand as correlative rights to this duty; for, if the rights of these others require the act *not* to be done, it is not the supervisors' duty to do it. This is clear, and we have an understanding of what the subject-matter of this suit is.

I may admit that it is a subject-matter within the juris-
diction of the United States Circuit Court, if lawfully
acquired. No one can deny that it is a subject-matter
over which the State court also may acquire jurisdiction.
These courts, therefore, have concurrent jurisdiction. It
is obvious that both, at the same time, · cannot exercise
jurisdiction and both enforce the same duty, or one en-
force it and the other deny it. There can be no conflict
here, for the law provides an open and plain way of
escape. "It is a well-settled doctrine that when the
United States and State courts have concurrent jurisdic-
tion, and the State courts first acquire jurisdiction of the
subject-matter involved, such jurisdiction becomes ex-
clusive and completely deprives the federal courts of
jurisdiction." *Ex parte Roberts*, 16 Iowa, 606; *Taylor
et al.* v. *Carryl*, 20 How. 595.

I have not been referred to an adjudication in conflict
with this doctrine, and I do not know of one either in the
State or federal courts. In *Taylor et al.* v. *Carryl*, Mr.
Justice CAMPBELL cites nine cases in federal courts and
several in the State courts in support of this doctrine.
It is quite unnecessary to multiply citations of authorities
to sustain it. It cannot be denied.

Which court acquired jurisdiction of the subject-matter
of the suit first? It is unnecessary to inquire whether
the mandamus case is a continuation of the actions of
plaintiff therein upon the coupons, or a new suit. I am
clearly of opinion that it is a new suit, but we will exam-
ine the question in the view that it is but a continuation
of the actions on the coupons.

The earliest of these actions was commenced on the
6th day of April, 1863.

The injunction suit in the State court was commenced
on the 13th day of December, 1860 ; that is, an appear-
ance was entered to the suit on that day. The action in

the State court, it seems, was commenced two years and four months before those in the federal court, and if the State court acquired jurisdiction the federal court did not.

I will now inquire whether the State court did acquire jurisdiction. I will consider that the injunction suit was commenced on the 13th day of December, 1860, and not inquire whether it was a continuation of another suit commenced in 1856, as claimed by plaintiffs.

The petition is sufficient in form and substance to give the court jurisdiction of the subject-matter. What was the subject-matter of which the court thereby acquired jurisdiction? The petition asks that the authorities of the county be forever enjoined and restrained from collecting any tax for the payment of certain railroad bonds, and for such other and further relief as equity and the nature of the case require, etc., etc. Here the subject-matter consists of the following:

1. The act of levying the tax.

2. The duty of the county authorities to levy the tax.

If the county authorities had no power to levy the tax, it was not their duty so to do. If the act of levying the tax was unconstitutional, they had no power. If it conflicted with the lawful rights of the plaintiffs in the injunction suit, it was not their duty to levy the tax.

Thus we see that the subject-matter of the injunction and mandamus actions was the same. This reasoning is hardly necessary to arrive at the conclusion. It may be reached at a step. The object of the injunction suit was to prevent the levy and collection of the taxes; the mandamus action is intended to enforce the levy and collection: therefore, the same subject-matter is involved in both suits.

It is urged that the State court did not have jurisdiction of the PERSONS of the board of supervisors, and that therefore, while it was competent for that court to acquire

jurisdiction of the subject-matter of the action, its judgment is void. I have no doubt upon this point. The action was commenced and appearance made while the county judge discharged all the functions now performed by the board of supervisors; among others, the levying of taxes. The action was entitled of his name and style of office, and so continued entitled, but it was against him officially that relief was sought. It appears that the supervisors employed counsel to defend the case, who appeared for them in the District and Supreme Courts. Now, it is a recognized principle of law that when one is interested in an action, and defends or prosecutes the same, though not appearing as a party to the record, he is bound by the judgment. The law which created the board of supervisors clothed it with all duties and powers pertaining to county matters, the levying of taxes, etc., which had before been discharged by the county judge, and by that law they were required to assume all duties pertaining thereto, before belonging to the office of county judge. Now, if an action were pending against the county judge officially, in matters pertaining to county affairs, and the board should employ counsel, and through him defend it, they would certainly be bound by a judgment therein, even though no change should be made in its title. Our code of procedure looks to substance, and suffers no right to be lost or duty to be evaded on account of the want of form in proceedings. Revision, section 2794, provides that no action shall abate by reason of the transfer of any interest therein during its pendency, and that the action may be continued against the original parties. This section may not be completely applicable to this case, but it is cited as an illustration of our general system of procedure.

It is also urged that the decree is void because the holders of the bonds which bore the coupons sued on were

not made defendants to the injunction suit. I have no difficulty here.

Under the Constitution of Iowa these bonds and coupons were prohibited; the county had no authority to issue them, and they were void, absolute nullities. Such is the effect of the adjudications of the Supreme Court of our State, and no court in the world has the power to annul those decisions, or require the courts of this State to hold differently in a case within their jurisdiction. It is not pretended that these decisions are in conflict with the laws or Constitution of the United States, or against the exercise of power by the United States. The United States Supreme Court cannot, therefore, review such decisions. I am not, therefore, to look to the United States courts, but to the courts of this State, for authority upon this point. These bonds and coupons are absolutely void, and were so from the beginning. They did not become void, but were so at the first. Now, there are no *degrees* in the *validity* or *nullity* of an instrument; I speak of a void, not a voidable, instrument. It cannot be affected in a measure with invalidity, nor can it be in a degree valid. It is perfectly legal and binding, or it is utterly illegal and void. It is no matter for what reason it is void; if *void* at all, for one cause or another, it is just as wanting in binding force. Now, if the instrument is void and not binding, it does not create any debt, and, of course, none can be transferred with the passing from hand to hand, or the transfer of the instrument. No debt passes, and that is what we understand when we speak of the transfer of paper. We do not mean the paper, which is the evidence of the debt; we mean the debt itself. The holder of such an instrument acquires no rights at all.

But it is said that they ought to have been made parties, that their rights might have been protected. We

have just seen that they have no rights. But it is replied that they ought to have a day in court to be heard upon that question. Suppose the question had been determined and established beyond controversy before the suit was brought, what benefit would the day in court give them? And that question was settled by the convention which adopted the Constitution. The Supreme Court, in deciding the bonds void, simply spoke the language of that instrument.

It is true that no party can be bound by a judgment unless he has his day in court. But this has application to adjudications of facts, not of law. Every citizen of this State, every one claiming rights under the Constitution or laws of this State, is bound by the adjudications of the law as made in every decision of the Supreme Court of the State. There was, in truth, no adjudication of fact in the injunction case, in the view I take of it, so far as the question of the validity of the bonds is concerned, about which there was or could have been an issue. The fact adjudicated was that certain railroad bonds had been issued by Lee county. This fact the bondholder, from the nature of the case, admits in claiming a right to be a party to the suit. That was the only fact necessary to be adjudicated in order to determine the question of law, which was that those bonds were prohibited by the Constitution.

Suppose a petition in chancery should allege, and it should so appear, that the supervisors of this county had issued their bonds amounting to $1,000,000, upon which they had borrowed that amount of money, to be used in aid of the Cretans in their struggle against the Turks, and that a tax is about to be levied to pay these bonds. Would a chancellor require the holder of these instruments to be made a party before restraining the levy of the tax? Yet, as we have seen, there being no degrees

in the validity of instruments, these bonds would be no *more* null than railroad bonds, and a holder thereof would be entitled to the same rights as a holder of a railroad bond. Another illustration will make the position I assume clear.

A. obtains a perpetual injunction against B. to restrain him from doing unlawful acts, no matter what, in violation of A.'s rights, for which he has no other remedy. After the injunction is made perpetual, C. insists that it is void, because he (C.) was the only one to be benefited by B.'s unlawful acts, and was not made a party to the action.

This is the precise case before me; the holder of these void railroad bonds insists that an injunction against the county authorities to restrain them from levying a tax in violation of law is void, because he, the only one to be benefited by the tax, was not a party to the suit.

If it be necessary that the holders of such void instruments be made parties to a proceeding to restrain the collection of taxes to pay them, this requirement will practically defeat any remedy. The United States Supreme Court holds that such bonds are commercial paper (a doctrine, however, which cannot be admitted), and being payable to bearer, they, of course, pass by delivery. They are, as we learn from the history of the business of the country, a subject of traffic. No trace can be kept of them. As a matter of fact, a corporation cannot know where its bonds may be found. It may be known to whom they were-first delivered, and that is all that can be known about them. If a case can occur in which these bonds are void, and the people attempt to invoke relief of the courts against the levying of taxes for the payment of such bonds, and if, before they can have that relief, they are required to do that which is practically impossible, namely, ascertain the persons

who hold the instruments, and make them parties to the suit, relief will be impossible, and all void paper of that kind will be enforced.

It is argued with great confidence that, if it be true that the United States Circuit Court has no jurisdiction of the mandamus proceeding, the judgments recovered by Thompson cannot be enforced, and he is without a remedy; that the United States court having assumed jurisdiction, and rendered the judgments, they must be enforced. I will not inquire whether there is or is not a process or proceeding whereby these judgments may be enforced. The argument brings us back to the very point of difference, that of jurisdiction. If the United States court has no authority to enforce the collection of taxes — the jurisdiction of the State court having attached to the subject-matter before the federal court had acquired jurisdiction, it follows that, whatever may be the consequences, the judgment and orders in the mandamus proceeding ought not to be, and cannot be, enforced. The fact that the federal court *assumed* jurisdiction, if wrongfully assumed, of course, does not make its judgments and process thereon valid. Neither does it follow that, because Thompson has recovered his judgments upon the coupons, he may enforce them in the mandamus proceeding. The injunction proceeding was commenced before the suits wherein those judgments were rendered. If the State court had jurisdiction in that proceeding, then the federal court seeks, through the mandamus action, to override and beat down the valid decree of a State court, upon the simple plea of power, supported, as all such assumptions are, upon the claim of "truth, justice and law." There does not appear to have been any attempt to reverse, annul or set aside that decree of the State court. It is utterly disregarded and held for naught by the federal court.

The beginning of this conflict of jurisdiction is found in *Gelpcke* v. *Dubuque*, 1 Wall. 176. The United States Supreme Court, abandoning a long course of adjudications, and annulling the spirit, if not the letter, of the congressional enactment establishing the laws of the States, as rules of decision for the federal courts, in that case gave construction to the Constitution and laws of this State adversely to the settled decisions of its Supreme Court. The fruits of that decision are here. These plaintiffs are under arrest, to be taken to the prisons of a distant city for the refusal to do an act which they are enjoined and restrained from doing by the decree of the State court, in an action wherein it had jurisdiction to the entire exclusion of the jurisdiction of the federal court. *Gelpcke* v. *Dubuque* is the undoubted parent of this unseemly conflict. See Mr. Justice MILLER's dissenting opinion in that case. 1 Wall. 208–210. That its doctrine will become the settled law of the Union no one can for a moment suppose. The people of the States will not consent that, even in "exceptional cases," the federal courts may preserve " truth, justice and law," by disregarding the statutes and constitutions of the States as interpreted by their highest courts. 1 Wall. 206. Such a course of decisions, if persisted in, will necessarily lead to other encroachments upon the rightful jurisdiction of the State courts, which will, sooner or later, provoke congressional legislation, wisely and more explicitly prescribing the force and effect of State constitutions and State laws, and the decisions of State courts construing them, upon the rights of the people when before the federal courts for adjudication.

Several objections are made to the decree in the injunction suit, which it is not necessary to consider. They are not such as are aimed at the jurisdiction of the

court, but at mere irregularities which in no sense can affect the validity of the decree, and are cured by presumptions that are to be exercised in favor of the validity of the judgments of all courts.

It is urged that the supervisors, after the rendition of the decree, were not served with an injunction. For some reason a copy of the decree seems to have been served upon the president and clerk, but upon no other member of the board. No such service was necessary in order to give the injunction effect upon the board. It is not the practice in this State, neither is it required by law, to issue process upon such decrees, nor to serve the defendants with copies thereof. They are presumed to take notice of the substance and requirements of the decrees, which are notice to the world of their contents.

It may be remarked that one of the supervisors, who is under arrest, was not a member of the board at the time of the service of the alternative mandamus, having been elected afterward. He was served with the peremptory writ. Now, of course, no one can be arrested for disobedience to a peremptory writ without first having been a party to the proceeding, and notified by an alternative writ. But I do not think this is irregular, and only mention it (and it ought to have been mentioned in another connection), to show that the objection of defendant's counsel, based upon the ground that the supervisors were not, by style of office, made parties to the injunction proceeding, is not tenable. In this case, the supervisor alluded to takes his position officially; the service on his predecessor of the alternative writ, and his refusal to vote for the levy of the tax, would, if the court had jurisdiction, justify his arrest on the attachment, so the supervisors succeeding officially the county

judge, and appearing by their counsel in the injunction suit, are bound thereby.

*Riggs* v. *Johnson County* (6 Wall. 166) is not in conflict with the principle upon which I hold that the State court first obtained jurisdiction of the subject-matter of this controversy. In that case the injunction proceeding was instituted in the State court after judgment was recovered upon the bonds in the federal court, but before the mandamus suit was instituted. The United States Supreme Court held that the mandamus suit being but a continuation of the suit on the bonds, the federal court first acquired jurisdiction. *Weber* v. *Lee County* (6 Wall. 210) was decided on the same state of facts as *Riggs* v. *Johnson County*.

Upon the question of the prior jurisdiction of the State court over the subject-matter of levy and collection of taxes, and of the officers of the county, I have no doubt. It follows that the United States Circuit Court could not, and did not, acquire jurisdiction, and all its acts and proceedings are therefore *coram non judice* and void. Upon this point I am clear, and there remains in my mind not even a question. I feel therefore bound, escape it though I would, to hold that the defendant restrains the plaintiffs without the authority of law.

Though I have protracted this opinion to an undue length, I feel called upon to add a few words not pertinent to the legal points involved. I have forborne to make any extended observations upon the conflict between the Supreme Court of the United States and the Supreme Court of this State upon the questions growing out of railroad corporation bonds. The conflict is most unfortunate, and, having participated in a recent decision of my own court upon that subject, I wish to escape none of the responsibilities, if there be any, on the part of the State court. The conflict is to be regretted, but there is

an incident of that conflict as much to be deplored as the conflict itself. I refer to the extremely disrespectful allusion to the Supreme Court of Iowa, in the opinion of Mr. Justice SWAYNE, in *Gelpcke* v. *Dubuque.* In this country the bench has no patent of respect save that of public confidence, and woe is the day when one court will aid, nay originate, an attack upon the integrity and public virtue of another court. Blind is that judge who does not see that such an attack, while it may lessen the court assailed in the public esteem, has a reflex influence, and will return with most mischievous effect upon himself. To the people of Iowa, and the bar especially, is that opinion a barbed arrow that will long rankle and wound. While the eminent judges of the Supreme Court of this State, against whom the attack was directed, have suffered naught in the loss of confidence and esteem of their fellow citizens, one would be ignorant of human nature who should deny that it has not had its effect in diminishing respect, at least, toward the judge from whom it emanated. The eminent public services, undoubted purity of character, and great learning and ability of the Iowa judges thus assailed rob the incident of any excuse. One of those judges, after having attained eminence as a legislator, has occupied a seat upon the bench of the Supreme Court for fourteen years; another has served the state as district judge, governor and justice of the Supreme Court for near twenty years; the third, as judge of the District and Supreme Courts for several years; all serving the State with the entire confidence of the whole people, and, like Cincinnatus, remaining poor. The only intimation derogatory to these eminent citizens emanated from the Supreme Court of the United States in the opinion referred to. I may thus speak, because it is the free impulse of justice toward those gentlemen.

Upon one other subject, not pertinent to the legal questions involved, I will venture a word. Much has been said, in court and out of court, of the position of the Iowa judiciary in this contest, and odious allusions to rebellion have dropped from judicial lips in reference to their action. Those who are informed upon the subject and the points involved understand that these are the idle words of men who know not whereof they speak, and that thoughts of resistance or conflict, resulting in violence and force, are vain. As I have pointed out, an appeal lies from my ruling in this case to the Supreme Court of the State, and if the decision of that tribunal be in conflict with the laws or Constitution of the United States, or against the exercise of any federal power, it may be reviewed by the Supreme Court of the United States. If there decided that these plaintiffs must be imprisoned, that court's mandate will be. obeyed by my brothers (for I know that I can speak for them), and I know that I will render it cheerful obedience, while my mind may continue to deny its correctness.

Violence in contempt of my order for the release of these plaintiffs will only be directed by mad advisers, and, inasmuch as there is a plain way to correct any errors I may have committed, would be utterly inexcusable, and subject one who would pursue that course to the most fearful responsibility. But I have no fear that the federal officers who hold in custody these plaintiffs will refuse, by violence, obedience to my order, for I know them to be law-abiding and prudent citizens.

One who has witnessed this examination can have no fear of conflict. Here before me are federal and State officers; counsel representing the conflicting views; thirteen citizens, among the most influential of the county, under arrest to be carried to a prison in a distant city out of their State, and other citizens as spectators of the

scene; all this speaks, to those who may not know the loyal, patriotic and law-abiding citizens of Iowa, of conflict and strife. But here, where are no bayonets, where nothing but the silent and unseen power of love for order and law rules, is no strife, no threat of conflict. Relying upon the courts to administer the law, all these stand in calm security.

And be it mentioned to the honor of the profession of the law, and of the learned counsel, representing both parties, that, during this zealously contested trial, where would seem to be occasion to provoke passion, the most commendable courtesy has prevailed. No improper allusion, no appeal to passion or prejudice has been heard, but only the principles of the law have received their attention in argument.

With such evidence of love of law and confidence in the judiciary, both federal and State, there can arise no conflict between federal and State governments. Both governments, constituting ONE WHOLE, may well rely upon such citizens for support.

It is my order that the plaintiffs stand discharged from the custody in which they are illegally held by the defendant, Harry Fulton.

## DISSENTING OPINION.

BECK, J. — Since the decision of this case at chambers, I have given the questions involved very considerable attention. Their great importance demanded that I should investigate the principles of my decision, and re-examine the authorities upon which it is planted. Having devoted whatever time seemed necessary to the labor, I have become most satisfactorily assured of the correctness of my conclusions upon all the points decided.

In addition to the authorities cited in my opinion in support of the jurisdiction of the State courts and judges to inquire into the cause of, and relieve from, illegal

imprisonment, under federal authority, several important cases, directly in point, have· fallen within my notice. The most important of them is the case of Reynolds, decided by the Hon. NATHAN K. HALL, United States district judge for the Northern District of New York; June, 1866, on *habeas corpus*, to inquire into the legality of the enlistment of the petitioner into the United States army. 6 Park. Cr. 276.

This case seems to have been considered with great care and industry on the part both of the counsel and the eminent and learned judge before whom it was tried. We are informed in the opinion that, for the purpose of giving the most thorough examination to the authorities, the cause was continued from the March to the June term. The United States district attorney, William Dorsheimer, appeared for the respondent, an officer of the United States army, and exhibited in his brief the fruits of the most commendable industry, by the citation of twenty-eight authorities in support of the point made by him, namely: "Judges of the State courts have no power to issue a writ of *habeas corpus*, or to continue proceedings under it when issued in cases of commitment or detainer under the authority of the United States." The cases cited by him are gathered from all conceivable sources, where they are preserved in print, and some of them are not even so preserved, as no reference as such is made to them. The reports, law journals and newspapers, as well as tradition, seem to have been put under tribute to furnish these authorities. A few cases were determined in courts of appeal; others before judges of such courts at chambers, and some others again before inferior courts, or judges thereof — probate judges and recorders. The industry of the learned United States district attorney enabled him to cite one case, at least, decided in a court and at a time that renders it of very questionable authority. This is the

case of Sarris in the recorder's court of Charleston, South Carolina, decided and reported in 1862. It is hardly probable that any case decided prior to the trial before Judge HALL would have escaped the vigilance of so able and industrious counsel. The cases referred to in the opinion rendered at the hearing before me at chambers, as denying the jurisdiction of the State courts, were cited.

Judge HALL states that, upon examination, he finds ten of the cases cited by the district attorney are not in point and one overruled; nine being not in print, were not accessible, and therefore not examined; six from the State of New York, Ohio and New Jersey, where the jurisdiction of the State courts is unquestionably recognized by the weight of authority, were decided by judges at chambers, three of them by probate judges, or judges of other inferior courts. *Booth* v. *Ableman* and *Spangler's Case* make up the number cited by the district attorney. In support of the jurisdiction of the State courts and judges, Judge HALL cites fifty-nine cases from twelve different States. In the course of his opinion, he says: "During my own service as judge in a State court, I exercised the power of discharging minors held under invalid enlistments in repeated instances, and without the jurisdiction being questioned, and I well know that the same authority was exercised by other State courts and judges. In the most of these instances not even a newspaper notice of the case was published." He expresses the belief "that some of the cases most frequently relied upon as denying the jurisdiction (of the State courts) will not, when carefully examined, and after the language has been deliberately considered in connection with the usual facts of the case, appear to deny the jurisdiction to discharge, if legal authority to detain is not shown, or deemed of much weight when compared with many of the numerous cases in which the jurisdiction has been

maintained." The learned judge, after proceeding to show conclusively, that Mr. Justice NELSON in his charge to the grand jury (1 Blatchford C. C. 635), and Mr. Justice McLEAN in *Norris* v. *Newton*, do not deny the jurisdiction of the State courts, and with some success, that the opinion of Chief Justice TANEY, in *Ableman* v. *Booth*, does not go to that length, uses the following language: "The authority of the decisions of the State courts and judges in support of their jurisdiction is absolutely irresistible and overwhelming, and if any doubt can be entertained as to the correctness of the proposition, that the opinion of Chief Justice TANEY and of Justices NELSON and McLEAN, must be considered as affirming, that the fact that the prisoner is held under the authority of the United States not only must be alleged but *proved*, in order to divest jurisdiction of a State court or judge in a *habeas corpus* case, there can certainly be no doubt that all those judges required not merely the allegation or return of facts, showing such authority, but also their actual existence, the actual truth of the return, and not the mere formal but false assertion of the fact that does not exist." Id. 381.

" Upon the most careful and deliberate consideration of the authorities that I have been able to give, I am of the opinion that the jurisdiction of State courts and judges in cases like this, and in cases of persons detained by United States officers under color of illegal enlistment, *or other pretense of authority derived from the United States when no such authority exists*, is well and properly established by an irresistible preponderance of authority." Id. 319.    *    *

He says, " that for quarter of a century the jurisdiction has been tacitly conceded and admitted by the general government; for it is quite certain that during a period of more than thirty years, in which the jurisdiction was constantly exercised by State courts and judges, no single

case was ever taken to the Supreme Court of the United States for the purpose of reversing, on the ground of want of jurisdiction, any decision of a state court or judge discharging a minor or other person from the army because he was held only under an illegal or void enlistment." Id. 280.

Since the trial of this case. before me at chambers, I have examined the charge of Mr. Justice NELSON (1 Blatchford, 642), to which I had not access when my opinion was written, and I concur with Judge HALL, that it does not go to the extent of denying the jurisdiction of a State court or judge to relieve one *illegally* held under pretense of federal authority. Judge HALL states (6 Park. Cr. 292), that this learned and venerable justice subsequently concurred with Judge SHIPMAN and Judge BLATCHFORD in sustaining the jurisdiction of the State courts and judges.

I have examined all the authorities to which I could have access, in addition to those referred to in my opinion rendered at chambers, as well as those cited by the United States district attorney in *Reynolds' Case*, and I am able to verify the learned judge's statement as to their effect and the points ruled.

I can also verify the statement of Judge HALL as to the constant exercise of the power of State judges, without question on the part of the United States officers. The learned judge of the first judicial district of this State — the Hon. FRANCIS SPRINGER — whose long experience upon the bench, as well as his great ability and the careful manner in which he habitually discharges his judicial duties, entitle his judgments and opinions to great weight, I know has exercised the jurisdiction by discharging one illegally held under authority of the general government. Other cases where the jurisdiction has been exercised by State judges are within my knowledge.

Since the trial of this case before me at chambers, I

have seen a very carefully prepared and able opinion of Mr. Justice TAPLEY, of the Supreme Court of Maine, in the case of McCrary on *habeas corpus*, decided at chambers in September, 1867, in which the jurisdiction of the State courts and judges is sustained, and it was exercised in that case.

I find that the jurisdiction has been exercised by State courts and judges in *fifteen* States, and in more than seventy reported cases, and doubtless in many other cases that have not been reported, and of which no mention has been made in the law journals and newspapers. Opposed to these, and almost unsupported, is *Ableman* v. *Booth*. I am justified in using the language of Judge HALL, that the jurisdiction of the State courts and judges " is well and properly established *by an irresistible preponderance of authority*."

My re-examination has satisfied me of the correctness of my rulings in the trial at chambers, upon all the questions decided. I am·most thoroughly satisfied that the United States Circuit Court of Illinois acquired no jurisdiction of the subject-matter of the mandamus action— jurisdiction having been acquired and exercised over the identical subject-matter by the State Supreme Court in the prior injunction proceedings.

I will proceed to notice a few of the points made by my brothers in their separate opinions, which, however, I had not seen before my views, as above expressed, were written. I shall do so briefly, and with no attempt at argument, but will content myself with stating the conclusions of my own mind. One conclusion arrived at by my brothers is, that by this *habeas corpus* proceeding it is attempted, in effect, to correct the errors of the United States courts; that, admitting these courts erred in the course of adjudications therein, upon the questions growing out of the litigation upon corporation railroad bonds,

yet, in the proceeding before us, their rulings cannot be reviewed and corrected by arresting the enforcement of the judgments in proceedings wherein these errors were committed. This I understand to be the point made in the opinions of the majority. The error is in the application of an undisputed principle of law to the facts of the case. It certainly cannot be claimed, and it cannot be understood, that any such a doctrine as the contrary of this point is contended for in this case, or in the remotest degree sanctioned in my opinion at chambers. My position, which has been misunderstood, is this: The judgment of a court, rendered in a proceeding wherein it has no jurisdiction, is void. Such a judgment cannot be enforced, and a citizen cannot be deprived of either his property or liberty by process issued upon it. I find by the record itself of the judgment of the United States District Court of Illinois, that that court did not have and could not acquire jurisdiction of the mandamus action, because jurisdiction of the identical subject-matter had before been acquired and exercised by the Iowa Supreme Court, thus depriving the federal courts of jurisdiction. This principle of law applied to these facts renders escape from my conclusion impossible. I do not understand that my brothers differ from me as to the facts; at least no difference is expressed in their opinion.

In this case I did not seek to correct the errors of the federal court, using the expression in its proper legal sense, but I simply declared void a judgment which, I found, was rendered by a court that had no jurisdiction of the subject-matter of the action wherein it was rendered. The distinction between correcting the errors of a court in a proceeding wherein it had jurisdiction by a collateral action in another court, and in a like action holding void a judgment because of want of jurisdiction, may be illustrated by one of the cases cited by the chief jus-

tice, viz.: *Ex parte Watkins*, 3 Pet. 193. In this case Watkins had been convicted upon indictment by the Circuit Court of the United States for the District of Columbia. He made application to the United States Supreme Court for a writ of *habeas corpus*, based upon the ground that the indictment charged no offenses punishable in the court wherein he was convicted, and of which it could take cognizance, and that, consequently, the proceedings resulting in his conviction were *coram non judice* and totally void. The Supreme Court refused the writ, holding, Chief Justice MARSHALL delivering the opinion, that the Circuit Court, in which the petitioner was convicted, was a court of record, having general jurisdiction over criminal cases, and that an offense cognizable in any court was cognizable in that court, and, if at all punishable by law, that court was competent to inflict the punishment. "To determine whether the offense charged in the indictment be legally punishable or not is among the most unquestionable of its duties and powers. The decision of this question is the exercise of jurisdiction, whether the judgment be for or against the prisoner."

Here it is demonstrated that the Circuit Court had jurisdiction of the subject, and that in the exercise of such jurisdiction it properly determined the question upon which the petitioner based the allegation of the illegality of his imprisonment.

The court holds that "an imprisonment under a judgment cannot be unlawful unless the judgment be an absolute nullity; and it is not a nullity if the court has general jurisdiction of the subject, although it should be erroneous."

The conclusion of the Supreme Court, therefore, is, that the writ could not be awarded; that the proceedings would operate to correct the error, if any should be

found, in the judgment of the Circuit Court, which could not so be done.

Now suppose, in this case, it had appeared in fact that the Circuit Court had no jurisdiction of the subject — of the offense for which the prisoner was indicted; that the court was of special jurisdiction, and the offense was by law excluded therefrom, the case would be very different. The judgment of the Circuit Court then would be void, a nullity, and the imprisonment thereon would be illegal, and all persons concerned in executing the judgment would be trespassers. See page 203 of the opinion in this case, and the following: *Elliott* v. *Piersol*, 1 Pet. 340; *Thompson* v. *Tolme*, 2 id. 163–169; *Wise* v. *Withers*, 3 Cranch, 337; *Harris* v. *Hardman et al.*, 14 How. 334.

In the case we have last supposed, it could not be claimed, in any collateral or direct proceeding to relieve a citizen from the oppression of such void judgment, that any court, delaring it void and disregarding it, would thus correct the errors appearing in the proceedings, as we are to understand this language when thus applied.

The writ of *habeas corpus* is intended to relieve the citizen from the illegal restraint of his liberty. If restrained upon a judgment void for want of jurisdiction, such restraint is illegal, and the writ is the appropriate remedy. If the restraint, however, is upon a judgment that is erroneous, such restraint is not illegal, and the writ cannot be used as a remedy for reviewing such judgment and correcting the errors therein.

Another position of my brothers is erroneous, or rather their arguments lead to an erroneous conclusion. It is this: The United States Supreme Court is the final arbiter of the questions involved in this case, upon which there is a conflict between this and that court. To my mind, the arguments lead to this result. The facts, which may be properly repeated in this connection, are these:

The State court holds certain county bonds void as being prohibited by the Constitution, and enjoins the counties from paying them. The federal court holds them valid. The action in the State court, to enjoin the collection of taxes for the payment of the bonds, was commenced before the suit in the federal court to enforce their payment. The State court thus acquired jurisdiction, to the exclusion of the federal court. To enforce the payment of the judgment, an action of mandamus is instituted in the federal court. It is resisted on the grounds that it is unauthorized by law, and that the federal court is excluded from jurisdiction of the subject on account of the prior acquired jurisdiction of the State court. Now, my brothers follow the decisions of the federal court upon all points affecting the legality of the mandamus proceeding and the jurisdiction of the federal court therein. They admit that these decisions are binding upon this court, while, in prior decisions, denying that we are bound by the ruling of the federal court as to the validity of the bonds, thus conceding that court to be the final arbiter in all questions as to the remedy, but denying its authority upon questions affecting the right. See *Chamberlain* v. *The City of Burlington*, 19 Iowa, 395; *McClure* v. *Owen*, 26 id. 243.

This court thus practically concedes that the judgments of the federal court upon questions arising under the laws and Constitution of this State are binding authority, and must be obeyed, though that obedience sets at naught and is in violation of our State Constitution and laws, as interpreted by this, the highest tribunal of the State. This result is in conflict with all prior decisions of this court, as well as all other courts of the country, both federal and State. It is a new doctrine, and, if recognized as law, will work a change in the administration of State laws. The United States Supreme Court will become the inter-

preter of State Constitutions and State laws, with power to enforce its judgments. The State tribunal will be, in this class of cases, subordinate and inferior courts. They will possess no power to enforce their judgments interpreting the Constitution and laws of their respective States, when not in accord with the decisions of the United States Supreme Court.

*Thomson* v. *County of Lee* (22 Iowa, 206) is cited by the chief justice in support of his conclusions that the decisions of the federal court upon the questions involved in this case are of binding authority upon us, and must be followed by this court. I am unable to see the bearing of this case upon this position, or that it, in the least degree, supports the conclusions reached. The point ruled is, that in an action upon a judgment of a federal court, brought in a court of this State, the defendant cannot set up and relitigate the defenses which were pleaded by and decided against him in the first action. It does not appear in the report of the case what those defenses were, and it is not intimated, that, if they had been of a character showing the utter want of jurisdiction of the federal court over the subject-matter of the action, and that such want of jurisdiction appeared upon the record of the federal court, this court would not have held the judgment void. As a matter of fact, I understand it was not pleaded in that action as a defense, that the federal court did not have jurisdiction of the subject-matter of the action. No such point is made in the brief of the counsel for the defendant. It is certainly not ruled in the opinion. The chief justice most certainly does not intend to be understood as holding that, in an action upon the judgment of a United States court, its nullity, because of want of jurisdiction, cannot, in a proper manner, be shown as a defense to recovery thereon; neither would he be understood to hold that *Thompson* v. *Lee County*

sustains that doctrine. Yet nothing short of it will sustain his conclusions. But as I understand the opinion of the chief justice, he holds that, as the question of jurisdiction in the mandamus action had been passed upon by the federal court, and the jurisdiction sustained, it could not be determined in the *habeas corpus* proceeding. This, if I am not mistaken, is his conclusion. There is no principle of the law settled so completely beyond question as the contrary doctrine. Judgments rendered in the absence of jurisdiction are void. Their nullity may be shown whenever and wherever they are attempted to be enforced, or any right is claimed under them.

It cannot be claimed that the determination of a court in support of its jurisdiction will cure the want of jurisdiction appearing upon its records, or that another court is precluded by such determination from passing upon the question, when the judgment of the first court is before it as evidence or as the foundation of an action. Can it be pretended, if the United States Circuit Court of Illinois should assume jurisdiction in a proceeding for the probate of a will, or any other case confessedly without its jurisdiction, and should formally and solemnly determine and adjudge in the proceedings that it possesses jurisdiction, that such adjudication will bind other courts when called upon to enforce its judgments? No one would say that such is the law. Here is the radical and fatal error at the very foundation of the opinion of Mr. Justice WRIGHT. He argues that, as the want of jurisdiction was pleaded as a defense to the mandamus action in the United States Circuit Court, and was therein adjudged insufficient, this court and all the world must take that adjudication as conclusive — a judicial determination not to be questioned. He is led into this grave error by forgetting that the *defense* of want of jurisdiction of the subject-matter of the action strikes at the authority of the court, and not, as

other defenses, at the merits of the action. If the court had no authority, no jurisdiction in the cause, its determination sustaining the jurisdiction, as all other adjudications therein, are simply nullities. This question of jurisdiction, it is obvious, may be determined by any other court in which the proceedings are brought in question. It is not like the defense of payment or release, which, if I remember correctly, are used in illustration by Justice WRIGHT. Adjudications upon these defenses cannot be questioned, because the court having jurisdiction of the case has the authority to determine them. But the same reasons will not support the conclusiveness of the adjudications upon the question of jurisdiction. If applied to that question it would amount to this and nothing more: The court has jurisdiction because it has so adjudged; that is, the *exercise* of the authority to adjudicate confers jurisdiction. But the very reverse of the proposition is true; jurisdiction confers authority to adjudicate. No one will say that any thing else can.

The chief justice, in his opinion, after adhering to and following the rulings of the United States Supreme Court, holding that the mandamus action is a process of the court in which it is pending, announces the well-understood doctrine, so indispensable to the harmonious working of our State and national governments, that there must be reciprocal non-interference by the federal and State courts with each other; that one shall not interfere with the operations of the other, either before or after judgment. To this doctrine do I most unreservedly assent, and it is the foundation of my conclusions in this case. My brothers do not deny that the State court had jurisdiction in the injunction action; they do not deny that the decree in the action is perfectly valid and binding on all the officers of the county, including the plaintiffs in this case, the supervisors. A repetition of facts is all the argument

that need be made to support my ruling under this doctrine. The State court had acquired jurisdiction in the injunction suit before the federal court had acquired jurisdiction in the action upon the coupons; before any legal proceeding of any character was instituted in the United States court to enforce the payment thereof; before the world knew what the ruling of the United States court would be upon these questions; before the questions were in any shape presented to that court. In the exercise of such undoubted jurisdiction the decree of the State court was rendered, and it is admitted on all hands to be valid and binding. But the United States court assumes jurisdiction of the subject-matter of the mandamus action after jurisdiction had been acquired and exercised by the State court, and overruled its decisions, sets at naught its decrees, and enforces performance of acts by the plaintiff, held by the State court illegal and in contempt of its lawful authority. Here is a direct and flagrant interference by the federal court with the operation of the State court. The doctrine, as applied by the chief justice in this case loses half its force, and amounts to simply this: that the State court shall not interfere with the operations of the federal court, without regard to the question whether jurisdiction was first acquired by the United States court. The State court is robbed of all authority and power to enforce its decrees in a case confessedly within its jurisdiction, acquired to the exclusion of the jurisdiction of the federal court.

The chief justice holds that it makes no difference if the injunction proceedings were commenced before judgment on the coupons or after, and, without assigning any reason for this conclusion, relies upon *The United States ex rel.* v. *Keokuk* (6 Wall. 520) to support it. The position may be admitted, if the date of the judgment, and not the commencement of the action upon the coupons,

were subsequent to the commencement of the injunction suit. It cannot be admitted if the commencement of the action was after the commencement of the injunction suit. The commencement of these actions determined the jurisdiction of the respective courts, that one acquiring jurisdiction in which the action was first commenced. It is not ruled in the case cited by the chief justice, nor in the other case of the same name (6 Wall. 514), that, if the injunction suit had been commenced before the action on the bonds, the county officers could not plead the injunction as an answer to the writ of mandamus. In these cases the dates of the commencement of the respective actions are not given. The dates of the judgment on the bonds, and the decree, are stated. In each case the ruling is expressly based on *Riggs* v. *Johnson Co.*, 6 Wall. 166. It is explicitly stated in that case that the injunction suit was commenced after the action on the bonds. It must be admitted that the cases against the city of Keokuk are decided upon the same state of facts as *Riggs* v. *Johnson Co.* Had the court intended to announce any such rule as is claimed by the chief justice, it is to be presumed that it would have been stated in terms, together with the peculiar facts of the case requiring its application. But this is not done in the opinion in either case. There is an evident mistake or misprint on page 519 in the date of the decree. It appears there as having been rendered in 1853, which was long before the bonds were issued. This date, doubtless, should be 1863.

If it should be held that the doctrine of *Riggs* v. *Johnson County* would prevail, even though the injunction proceedings were commenced before the action in the federal court, it would be a *strange interference* by the United States court with the rightful exercise of authority by the State court. The State court, in a cause con-

fessedly within its jurisdiction, renders a decree. The decree, years after its rendition, is found to stand in the way of the enforcement of a judgment of a United States court in a proceeding subsequently commenced. It is disregarded and held for naught, on the ground that it interferes with the process of the federal court. I will not undertake to point out the dangerous tendencies and the evil effects and consequences of such doctrine. They are apparent to every mind.

The chief justice objects to the injunction proceedings because the bondholders were not parties therein. He does not insist that they were necessary parties; neither does he say that the decree was for that reason void; but concludes that the proceedings were, as to them, *res inter alias acta*. I am unable to admit the force of the objection. It is not denied that the State court had jurisdiction of the subject-matter of the injunction suit and of the county officers, the predecessors of the supervisors. It could then render a decree of full force and binding effect upon the parties to the action. The chief justice does not think that the bondholders were necessary parties to the action. If not necessary parties, can it be pretended that the court did not have jurisdiction because they were not made defendants? If it had jurisdiction of the subject-matter and of the parties before it, its decree is valid and binding upon these parties. In the exercise of that jurisdiction it enjoined the county officers from levying a tax to pay the bonds. But it is said that the decree does not bind the bondholders. Let this be admitted. It cannot be denied that it binds the county officers, for over them the court had jurisdiction. Because the bondholders are not bound by the decree, though the county officers are, the chief justice arrives at the conclusion that the decree may be held for naught by the federal court. Here, then, is a valid decree disregarded, because *proper*

parties are not made defendants to the action, and held void as to the *necessary* parties who are before the court. . This result cannot be sustained by the authorities. But it is argued, that, as the bondholders' rights were affected by the decree, and they had not a day in court, the decree ought not to be enforced. The answer to that objection is this: The want of proper parties does not render the decree void as to the necessary parties before the court. The decree does not preclude the bondholders from having their day in court, by proper proceedings, to review or set aside the decree.

The chief justice argues, that it would be illogical to insist, and a strange doctrine, that Thompson has a valid judgment, yet the court rendering it has no power to enforce its payment. The statement of fact is incorrect. The United States Supreme Court has held that there is another manner of enforcing payment than by compelling the supervisors to levy taxes; that a commissioner may be empowered by the court to levy and collect of the people and pay over to the creditor the amount of his debt. See *Supervisors* v. *Rogers*, 7 Wall. 175. There may be other ways of enforcing payment of this judgment. Admitting, however, the statement to be strictly correct, it is not the only thing that is illogical and strange in this corporation bond litigation. It is not denied by the chief justice—it never has been denied —that the State court had rightful jurisdiction in the injunction suit, and that its decree therein was lawfully rendered. But we have the illogical and strange result, under the ruling of the chief justice, that this valid judgment cannot be enforced—may be disregarded and over ridden by the federal courts, and the unlawful acts, which it was designed to restrain, may be commanded and compelled by the process of the United States court. The source of all these strange, inconsistent and illogical results

and of the conflict of jurisdiction, which cannot be too earnestly deprecated, is the doctrine of *Gelpcke* v. *Dubuque.*

The United States Supreme Court, in that case, abandoned a rule that had been recognized from the earliest days of the government, and which is the very foundation of the judicial system of the Union. The result is inevitable. If adhered to, precedent and consistency, legal principles and sound reason must give way to power, that the judgments of the United States courts may produce their "legitimate fruits." The extent of the disturbance, which these adjudications of the United States Supreme Court will produce in our judicial system, cannot be predicted nor foreseen. Without the restraint or control of rules designed to harmonize our dual form of government the federal courts will very soon assume and exercise jurisdiction upon subjects now supposed to be exclusively within the jurisdiction of the State courts. If these State courts follow the doctrine of my brothers, that the federal courts have jurisdiction in all cases where they so determine, assumption of authority will be most rapid, and the day is not far distant when the people of every State must look to the United States Supreme Court as the final arbiter of all questions arising in the administration of the law, and in the interpretation of State constitutions and State statutes.

All other objections, urged by the chief justice and other members of the court, are, as I believe, sufficiently answered in my opinion rendered in this case at chambers, which I file with and make a part of this opinion. I am satisfied to rest upon it, as a re-investigation of the questions involved, with all the care and time necessary assures me of the correctness of my conclusions upon all points therein ruled. I am constrained to dissent from the opinions of the majority, and to hold that my judgment at chambers ought to be affirmed.